**United States District Court**
For the Northern District of California

1

2

3

4                    IN THE UNITED STATES DISTRICT COURT

5                 FOR THE NORTHERN DISTRICT OF CALIFORNIA

6

7   TINA WALTER, CHRISTOPHER BAYLESS   ) Case No. 09-2136 SC
    and ERIC SCHUMACHER, individually  )
8   and on behalf of all others        ) ORDER GRANTING IN PART AND
    similarly situated,                ) DENYING IN PART MOTION TO
9                                       ) DISMISS
                    Plaintiffs,         )
10                                      )
                                        )
11          v.                          )
                                        )
12                                      )
    HUGHES COMMUNICATIONS, INC., and    )
13  HUGHES NETWORK SYSTEMS, LLC,        )
                                        )
14                  Defendants.         )
                                        )
15  _____

16  I.    **INTRODUCTION**

17          Plaintiffs Tina Walter ("Walter"), Christopher Bayless

18  ("Bayless") and Eric Schumacher ("Schumacher") (collectively,

19  "Plaintiffs") have brought this purported class action lawsuit

20  against their internet provider for supplying internet services

21  that, they allege, are significantly slower than advertised.  See

22  Am. Consolidated Class Action Compl. ("Am. Compl."), Docket No. 18.

23  The internet provider, comprised of Hughes Communications, Inc.,

24  and Hughes Network Systems, LLC (collectively, "Hughes" or

25  "HughesNet"), has filed a Motion to Dismiss ("Motion").  Docket No.

26  20.  The Motion is fully briefed.  See Docket Nos. 30 ("Opp'n"), 37

27  ("Reply").  Having considered all of the briefs submitted by the

28  parties, the Court concludes that this Motion is suitable for

1  resolution without oral argument.  For the reasons stated below,

2  Hughes' Motion is GRANTED IN PART and DENIED IN PART.

3

4  **II.  <u>BACKGROUND</u>**

5      Both Hughes Communications, Inc., and Hughes Network Systems,

6  LLC, are Delaware corporations, with their principal place of

7  business in Germantown, Maryland.  Am. Compl. ¶¶ 9-10.  Hughes is a

8  satellite broadband internet service provider, which supplies

9  internet access to its customers via satellite.  <u>Id.</u> ¶ 1.  Because

10 this service does not require cable or phone wires, Hughes is able

11 to offer its services to consumers located in remote areas where

12 other broadband services are generally unavailable.  <u>Id.</u> ¶¶ 1, 29.

13 Plaintiffs are each California residents who have purchased various

14 services from Hughes, and have found these services to be lacking.

15 <u>Id.</u> ¶¶ 56-72.  Plaintiffs seek to represent the estimated 80,000

16 California citizens who have subscribed to Hughes' services during

17 the four-year period prior to the filing of this action.  <u>Id.</u> ¶¶

18 13, 16.[1]

19      **A.  <u>Allegations Related to Hughes' Advertising</u>**

20      As a provider of broadband internet services, Hughes has

21 marketed its services by representing the high speeds and data

22 transfer rates of the internet connections that it offers.  It

23 provides a variety of services at different speeds and prices, such

24 as "residential plans [that] offer speeds up to 1.5 megabits and

25 start at $59.99 per month.  Small-business plans start at $99.99

26

27 _____

   [1] Plaintiffs also seek to include a subclass of "consumers" as
   defined by California's Consumer Legal Remedies Act ("CLRA"), Cal.

28 Civ. Code § 1761(d), who were Hughes' subscribers in the three
   years prior to filing this action.  Am. Compl. ¶ 14.

2

**United States District Court**
For the Northern District of California

1  per month and offer maximum speeds of up to 2 megabits per second."

2  Id. Ex. A ("Aug. 1, 2006 Newsletter") at 1.  On its website, Hughes

3  advertises that its services will allow its users to "download Web

4  pages quickly and ensure timely email delivery."  Id. Ex. B ("Pl.s'

5  Printout of Hughes Website") at 1.  It claims to offer "super-fast,

6  satellite Internet access" with "no dialing in, no waiting and no

7  tied-up phone lines.  You can download files in seconds, check

8  email instantly and surf faster than you ever imagined."  Id. at 2.

9  According to the website, the connection is "up to 30x faster than

10  dial-up," allows users to "[f]lip through Web pages like turning

11  the pages of a book," and "[d]ownload large files in minutes, not

12  hours."  Id. at 3.

13      As Hughes points out, its website also includes a page that

14  describes the "[s]peeds you can expect" from its services.

15  Mitchell Decl. Ex. A ("Hughes Printout of Hughes Website") at 1-2.[2]

16  This section states that data transfer speeds "will vary based on a

17  variety of factors including the configuration of your computer,

18  the number of concurrent users, network or Internet congestion, the

19  speed of the Websites you are accessing, and other factors.  Stated

20  speeds and uninterrupted use of service are not guaranteed."  Id.

21  _____

22  [2] Christopher Mitchell, counsel for Hughes, submitted a declaration
   in support of the Motion, Docket No. 21, which attached a printout
23  of Hughes' website.  Hughes has submitted a Request for Judicial
   Notice, Docket No. 22, which refers to this printout.  Plaintiffs
   have cited and described various portions of Hughes' website
24  throughout their Complaint, and they have not questioned the
   authenticity of the printout submitted by Hughes.  See al-Kidd v.
25  Ashcroft, 580 F.3d 949, 955 n.6 (9th Cir. 2009) (taking judicial
   notice of entire contents of document cited in complaint and
26  available online).  The Court notes that the Amended Complaint
   appears to specifically describe the portion of the website that
27  Hughes has submitted.  Am. Compl. ¶¶ 37, 49-50.  Considering the
   Amended Complaint's direct references to this portion of the
28  website, the Court finds that it may consider the printout without
   converting this Motion into a motion for summary judgment.

It describes each particular plan that is available to its customers, including the Home service plan ("download speeds of up to 1.0 Mbps, with typical speeds of about 550 Kbps to 650 Kbps during peak times") and Pro plan ("download speeds of up to 1.2 Mbps, with typical speeds about 700 Kbps to 800 Kbps during peak times"), all the way up to its ElitePremium Plan ("maximum download speeds of up to 5 Mbps, with typical speeds about 2.7 to 3 Mbps during peak times").[3] <u>Id.</u> at 3.

**B.    Allegations Related to Hughes' Performance and Service Practices**

Plaintiffs claim that "[i]n reality, HughesNet customers consistently receive slow and spotty service that falls woefully short of the fanciful claims" set forth in Hughes' website and advertisements, and that Hughes' "service during peak times generally performs at speeds lower even than what HughesNet states are 'typical' speeds . . . ." Am. Compl. ¶¶ 36-37.  Plaintiffs claim that slow speeds extend into non-peak, low volume periods. <u>Id.</u> ¶ 44.  Plaintiffs allege that Hughes' advertising statements were "meant to[] and did induce the Class [to] enter[] into agreements for HughesNet's satellite internet service," and that Hughes encourages its customers to upgrade to more expensive services to obtain faster transfer speeds.  <u>Id.</u> ¶¶ 38-39.

Plaintiffs allege that the slow speeds of Hughes' services are the result of Hughes' practice of "oversell[ing] and/or cap[ping] its customers' internet services such that the actual speeds

---

[3] The abbreviations "Mbps" and "Kbps" stand for megabits per second and kilobits per second, respectively.  Each megabit is equivalent to about 1000 kilobits.  Consequently, the "typical" speeds disclosed above are roughly 55% to 65% as fast as the download speeds that these connections can get "up to."

obtainable under any of the respective service plans is substantially and systematically slower than is advertised." Id. ¶ 41.  Plaintiffs also allege that Hughes blocks its users from making certain connections, namely Peer-to-Peer (P2P) connections. Id. ¶¶ 3.f, 42.  Finally, Plaintiffs allege that Hughes implements a "Fair Access Policy" ("FAP") that limits the amount of data that its users may transfer, and which permits Hughes to temporarily reduce a customer's transfer speeds when the customer downloads an amount of data over a short period of time in excess of certain download thresholds.  Id. ¶¶ 46-47.  Plaintiffs claim that "HughesNet's description of and disclosures about the FAP are misleading" because it states that "a small percentage of subscribers who exceed [the threshold] will experience a temporary reduction of speed," while in fact "a large percentage of subscribers experience lengthy shutdowns if they exceed the FAP threshold, sometimes for days at a time." Id. ¶ 48.

**C.   <u>Allegations Related to Provisions in Hughes' Subscriber Agreement</u>**

Plaintiffs' Amended Complaint does not stop at the description of the services that Hughes provides its subscribers; it also describes an allegedly illegal termination fee that Hughes imposes when its customers attempt to end their service before the expiration of Hughes' two-year contracts.  Id. ¶ 53.  The Subscriber Agreement states:

> In the event you cancel your subscription to the Service prior to the expiration of the minimum commitment period specified for your applicable service plan, you may be subject [to] a termination fee of up to $700.  The exact amount of termination charges which will apply is a function of when your account is terminated and

5

1   the type of Service Plan you are on.

2  Id. Ex. D ("Subscriber Agreement") ¶ 2.3.

3      Plaintiffs describe Hughes' practices as follows:  "HughesNet

4  unilaterally imposes early termination penalties of hundreds of

5  dollars on [customers who terminate their services early], under

6  purported authority of the Subscriber Agreement.  The $400 fee is

7  imposed without any individualized analysis of the actual damages

8  incurred, and even in cases in which HughesNet materially breached

9  the terms of its agreement."  Id. ¶ 53.

10     Plaintiffs also refer to the Subscriber Agreement's provision

11  requiring arbitration of all disputes and a "waiver of any class

12  action arbitration," as well as a requirement that all disputes be

13  resolved under Maryland law.  Id. ¶ 54.  The provision reads, in

14  pertinent part, as follows:

15          This Agreement and all of the parties' respective
            rights   and   duties   in   connection   herewith,
16          including,   without   limitation,   claims   for
            violation   of   state   consumer   protection   laws,
17          unfair   competition   laws,   and   any   claims   in   tort
            shall  be  governed  by  and  construed  in  accordance
18          with  the  laws  of  the  State  of  Maryland,  in  the
            United   States,   excluding   its   conflicts   of   laws
19          provisions.   Any  such  controversy  or  claim  shall
            be  settled  by  arbitration,  and  administered  by
20          the  American  Arbitration  Association  under  its
            Commercial  Arbitration  Rules. . . .   There  shall
21          be  no  class  action  arbitration  pursuant  to  this
            Agreement.

22

23  Subscriber Agreement ¶ 16.  Notably, Hughes has not sought to

24  invoke the arbitration or anti-class action portions of this

25  provision against Plaintiffs, although it has insisted on the

26  exclusive applicability of Maryland law.  Mot. at 17-21.

27      **D.   Individual Plaintiffs' Experiences**

28  Bayless subscribed to Hughes' "Pro" service plan, which Hughes

United States District Court
For the Northern District of California

represented could provide "up to 1.2Mbps/200Kbps in download/upload speed" in December of 2005, and upgraded to the "ProPlus" service plan (up to 1.6 Mbps) in November of 2006. Am. Compl. ¶ 56. He experienced frequent service interruptions and slowdowns, and found that he was sometimes subject to slowdowns implemented under the FAP. Id. ¶ 57. He states that his average speeds were approximately 450 Kbps. He eventually upgraded to the $179.00 per month "ElitePlus" plan (up to 3 Mbps, which he states was advertised as providing minimum speeds of 1.2 Mbps). Id. ¶ 58. He found the speeds to be "approximately half those promised or advertised," and even "worse than they had been on the cheaper ProPlus plan." Id. He terminated his service in November of 2008 and paid a $300.00 cancellation fee. Id. ¶ 59.

Schumacher first signed up for a "TwoWay Service" plan with Hughes in April of 2004, for $59.99 per month. Id. ¶ 60. He upgraded to the slightly more expensive "Pro" plan ($69.00 per month for up to 1.2 Mbps) after experiencing slow service. Id. ¶¶ 61-62. Even though this service is advertised as achieving "typical" speeds of "about 700 Kbps to 800 Kbps during peak times," Hughes Printout of Hughes Website at 2, Schumacher clocked the speed of his connection "on hundreds of occasions," and found that "[a]t no time during non-peak hours did he ever achieve a download speed of 1.2 Mbps. The average speed he achieved during non-peak hours was 767 Kbps." Am. Compl. ¶ 65. (emphasis in original). The average download speed for both peak and non-peak hours was 651 Kbps. Id. Schumacher upgraded to the "Small Office" plan in March of 2008 (up to 1.5 Mbps), found the service unsatisfactory, and terminated his service in or around January of 2009. Id. ¶¶ 66-68.

**United States District Court**
For the Northern District of California

1     Walter subscribed to the "Home" service plan in June or July

2  of 2006.  She experienced slow transfer speeds and found that the

3  "FAP was implement[ed] more stringently than the disclosures to her

4  had represented."  Id. ¶ 70.  She claims that the network began to

5  slow even "before she reached the represented data threshold" set

6  out by the FAP.  Id.  She eventually switched to the "Pro" plan

7  ($69.00 per month for 1.2 Mbps) and later to the "Elite" plan (2

8  Mbps for $119.99 per month).  Id.  She frequently experienced

9  speeds below the "typical" speeds advertised by Hughes, even during

10 non-peak times.  Id. ¶¶ 71-72.

11    Plaintiffs have asserted six causes of action, including: (1)

12 violation of the California Consumer Legal Remedies Act ("CLRA"),

13 Cal. Civ. Code §§ 1750 et seq.; (2) violation of California's

14 Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 et

15 seq., and California's False Advertising Law ("FAL"), id. §§ 17500

16 et seq.; (3) negligent misrepresentation and omission; (4)

17 intentional misrepresentation and omission; (5) money had and

18 received; and (6) declaratory relief.  Id. ¶¶ 73-131.  They filed

19 this action against Hughes in this Court in May of 2009, asserting

20 diversity jurisdiction.  Id. ¶ 11.

21

22 **III. LEGAL STANDARD**

23    A motion to dismiss under Federal Rule of Civil Procedure

24 12(b)(6) "tests the legal sufficiency of a claim."  Navarro v.

25 Block, 250 F.3d 729, 732 (9th Cir. 2001).  Dismissal can be based

26 on the lack of a cognizable legal theory or the absence of

27 sufficient facts alleged under a cognizable legal theory.

28 Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir.

1990).  Allegations of material fact are taken as true and
construed in the light most favorable to the nonmoving party.
Cahill v. Liberty Mutual Ins. Co., 80 F.3d 336, 337-38 (9th Cir.
1996).  Although well-pleaded factual allegations are taken as
true, a motion to dismiss should be granted if the plaintiff fails
to proffer "enough facts to state a claim for relief that is
plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544,
547 (2007).  The court need not accept as true legal conclusions
couched as factual allegations.  Ashcroft v. Iqbal, 129 S.Ct. 1937,
1949-50 (2009).  "Threadbare recitals of the elements of a cause of
action, supported by mere conclusory statements, do not suffice."
Id. at 1949.

Where plaintiffs allege fraud, or conduct that is sufficiently
"grounded in fraud," they must plead their claim with particularity
as required by Rule 9(b) of the Federal Rules of Civil Procedure.
See Edwards v. Marin Park, Inc., 356 F.3d 1058, 1065-66 (9th Cir.
2004); Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1106 (9th Cir.
2003).  Plaintiffs must include "the who, what, when, where, and
how" of the fraud.  Vess, 317 F.3d at 1106 (citations omitted).  A
plaintiff satisfies the particularity requirement only if his or
her allegations are "specific enough to give defendants notice of
the particular misconduct which is alleged to constitute the fraud
charged so that they can defend against the charge and not just
deny that they have done anything wrong."  Bly-Magee v. California,
236 F.3d 1014, 1019 (9th Cir. 2001) (citation and internal
quotation marks omitted).

///

///

United States District Court
For the Northern District of California

**IV.   DISCUSSION**

    **A.   Choice of Law**

       Hughes argues that Plaintiffs' first and second causes of action, for violation of the CLRA, UCL and FAL, must be dismissed because the parties agreed by contract that Maryland law would be applied to resolve any dispute between them related to Hughes' services.  Mot. at 17-21.  By accepting the Subscriber Agreement, Plaintiffs agreed to have all of their "respective rights and duties in connection" with their service agreements, "including, without limitation, claims for violation of state consumer protection laws, unfair competition laws, and any claims in tort . . . governed by and construed in accordance with the laws of the State of Maryland . . . ."  See Subscriber Agreement ¶ 16.  Plaintiffs argue that this Court should refrain from applying Maryland law because "Maryland consumer law in general conflicts with California's pro-consumer statutes and policies."  Opp'n at 17-23.  As a federal court sitting in diversity, this Court must apply California's choice-of-law principles to determine whether to enforce the Subscriber Agreement's choice-of-law provision.  See Estate of Darulis v. Garate, 401 F.3d 1060, 1062 (9th Cir. 2005).

       In opposing enforcement of the choice-of-law provision in the Subscriber Agreement, Plaintiffs have focused primarily upon the arbitration clause and the bar upon class action arbitration.  Id. at 17-20.  While California courts have long recognized consumers' protected rights to bring class actions under California's various consumer protection statutes, see, e.g., Am. Online, Inc., v. Super. Ct., 90 Cal. App. 4th 1, 17-18 (Ct. App. 2001) (hereinafter "AOL"), Hughes has not actually sought to enforce these provisions

against Plaintiffs, and there is no indication that Hughes intends to do so in the future.  "[A] separate conflict of laws inquiry must be made with respect to each issue in the case." Wash. Mutual Bank, FA v. Super. Ct., 24 Cal. 4th 906, 920 (Ct. App. 2001).  At this point, the Court sees no reason to adjudicate the as-of-yet hypothetical dispute regarding the enforceability of the arbitration and anti-class-action provisions.  "Accordingly, the Court finds that the issues raised by the arbitration provision are irrelevant to the issue currently presented; if defendant seeks to compel arbitration, the Court will conduct a separate choice-of-law analysis on that issue." Dajani v. Dell, Inc., No. 08-5285, 2009 U.S. Dist. LEXIS 30194, *6-7 (N.D. Cal. Mar. 26, 2009) (declining to resolve allegations regarding unenforced arbitration provision, but addressing choice-of-law provision).

Under California law, where a contractual clause could have the effect of waiving legal protections that are afforded by California law and protected by an antiwaiver provision, the party seeking enforcement has the burden of proof. AOL, 90 Cal. App. 4th at 10-11.  Plaintiffs' first cause of action raises issues under the CLRA, which includes an express antiwaiver provision stating that "[a]ny waiver by a consumer of the provisions of this title is contrary to public policy and shall be unenforceable and void." Cal. Civ. Code § 1751.  Hughes therefore has the burden of proving that the choice-of-law provision is enforceable. See AOL, 90 Cal. App. 4th at 10-11 (finding that party seeking enforcement held burden of proof, where opposing party had brought claims under CLRA and UCL).

California follows the Restatement Second of Conflict of Laws

1   ("Restatement"), "which reflects a strong policy favoring

2   enforcement of such provisions." Nedlloyd Lines B.V. v. Super.

3   Ct., 3 Cal. 4th 459, 464-65 (1992).  As the California Supreme

4   Court has paraphrased, courts must first "determine either: (1)

5   whether the chosen state has a substantial relationship to the

6   parties or their transaction or (2) whether there is any other

7   reasonable basis for the parties' choice of law." Id. at 466

8   (citing Restatement § 187(2)).  "If one of the parties resides in

9   the chosen state, the parties have a reasonable basis for their

10  choice." Id. at 467 (quoting Consul Ltd. v. Solide Enterprises,

11  Inc., 802 F.2d 1143, 1147 (9th Cir. 1986)).  Plaintiffs concede

12  that Hughes' principal place of business is located in Maryland,

13  Am. Compl. ¶¶ 9-10, and there can therefore be no reasonable

14  dispute over whether the parties had a substantial relationship

15  with the chosen state. See Nedlloyd, 3 Cal. 4th at 467.

16      "[T]he Court must next determine whether the chosen state's

17  law is contrary to a *fundamental* policy of California.  If there is

18  no such conflict, the court shall enforce the parties' choice of

19  law." Id. at 466 (emphasis in original).  "The mere fact that the

20  chosen law provides greater or lesser protection than California

21  law, or that in a particular application the chosen law would not

22  provide protection while California law would, are not reasons for

23  applying California law." Medimatch, Inc. v. Lucent Techs., Inc.,

24  120 F. Supp. 2d 842, 861-62 (N.D. Cal. 2000).  Hughes argues that

25  enforcing the laws of Maryland would not be contrary to a

26  fundamental policy of California because Maryland's consumer

27  protection laws offer "comparable protections." Mot. at 19.  They

28  refer to the Maryland Consumer Protection Act ("MCPA"), Md. Code

1    Ann., Com. Law §§ 13-101 et seq.  Id.  It states that it is "not

2    materially different from [] the analogous California consumer

3    protection[] statutes," and cites several cases that have made

4    similar observations.  Id.

5        This Court agrees that activities prohibited by the MCPA are

6    nearly identical to those forbidden by the CLRA.  Plaintiffs allege

7    that Hughes violated seven provisions of the CLRA: it represented

8    that its services have characteristics which they do not have, Cal.

9    Civ. Code § 1770(a)(5); it represented that its services were of a

10   particular standard or quality when they were of another, id.

11   § 1770(a)(7); it advertised its services with the intent to not

12   sell them as advertised, id. § 1770(a)(9); it advertised its

13   services with the intent not to supply reasonably expectable

14   demand, id. § 1770(a)(10); it misrepresented that it had delivered

15   the promised services, id. § 1770(a)(14); and it inserted

16   unconscionable provisions or improper remedies in the Subscriber

17   Agreement, id. § 1770(a)(16), (a)(19).  See Am. Compl. ¶¶ 77-79.

18   Each of these provisions, except for the provision related to

19   unconscionable contract provisions or remedies, can be paired with

20   an arguably analogous prohibition in the MCPA.  See MCPA § 13-

21   301(2)(i), (2)(iv), (5)(i)-(ii), 9(iii).  Plaintiffs' UCL claims

22   are based upon Hughes' alleged misrepresentations about its

23   services, as well as its use of the FAP and early cancellation

24   fees.  Am. Compl. ¶ 91.  Hughes does not explain precisely how each

25   of these claims could be cognizable under the MCPA, but this Court

26   will assume, arguendo, that Maryland law creates causes of actions

27   that are comparable to those of California.  The Court is satisfied

28   that Maryland law prohibits roughly the same conduct as that

13

1   prohibited under California law.

2       As Plaintiffs point out, the greatest difference between
3   California and Maryland law appears to be in the remedies that are
4   available to plaintiffs.  The CLRA permits plaintiffs to recover
5   both actual damages and punitive damages, to obtain equitable
6   relief enjoining illegal acts or practices of defendants, and to
7   seek any other relief that the court deems proper.  Cal. Civ. Code
8   § 1780(a).  In contrast, the remedy set out by the MCPA "is purely
9   compensatory; it contains no punitive component.  Indeed, any
10  punitive assessment under the [M]CPA is accomplished by an
11  imposition of a civil penalty recoverable by the State under § 13-
12  410, as well as by criminal penalties imposed under § 13-411.
13  Thus, in determining the damages due the consumer, we must look
14  only to his actual loss or injury caused by the unfair or deceptive
15  trade practices."  Golt v. Phillips, 308 Md. 1, 12 (1986); see also
16  MCPA § 13-408(a) ("[A]ny person may bring an action to recover for
17  injury or loss sustained by him as the result of a practice
18  prohibited by this title.").  The MCPA allows no punitive damages,
19  because its private enforcement provision "was not intended to
20  punish [defendants] or set an example for similar wrongdoers."
21  Citaramanis v. Hallowell, 328 Md. 142, 154 (1992).

22      Similarly, the UCL and FAL both permit injunctive relief.
23  Cal. Bus. & Prof. Code §§ 17203, 17535.  Hughes has not commented
24  on whether the MCPA would provide Plaintiffs an opportunity to seek
25  injunctive relief of the kind permitted by California law.  This
26  Court's own reading of the statute is that it would not.  See MCPA
27  § 13-406 (allowing attorney general to seek injunction; making no
28  mention of private plaintiffs); see also Citaramanis, 328 Md. at

United States District Court
For the Northern District of California

1   150 ("[T]he [M]CPA's public enforcement mechanisms are set up to

2   prevent potentially unfair or deceptive trade practices from

3   occurring, even before any consumer is injured, whereas § 13-408(a)

4   requires that actual 'injury or loss' be sustained by a consumer

5   before recovery of damages is permitted in a private cause of

6   action.").

7        Hughes' only response is to perfunctorily dismiss the

8   differences between California and Maryland law as merely

9   concerning remedies, stating that "[t]he relevant question is not

10  whether Maryland law provides exactly the same *remedies* as the UCL

11  and CLRA, but rather whether the MCPA offers comparable *substantive*

12  *protections* and covers the same *conduct* as the California

13  statutes."  Reply at 13 (emphasis in original).  To support this

14  proposition, Hughes cites two cases from the Northern District of

15  California: Medimatch, 120 F. Supp. 2d 842, and Brazil v. Dell,

16  Inc., 585 F. Supp. 2d 1158 (N.D. Cal. 2008).  Neither of these

17  cases support Hughes' proposition that a difference between the

18  laws of two states cannot be "fundamental" merely because it is a

19  difference in available remedies.

20       Brazil involved a consumer dispute under the UCL, FAL and

21  CLRA, in which the plaintiffs had assented to a choice-of-law

22  provision that required disputes to be resolved in accordance with

23  the law of Texas.  585 F. Supp. 2d at 1161.  The district court

24  noted that Texas law differed from California law in certain minor

25  respects, but found Texas law to be largely analogous in all

26  important respects, and specifically found that the plaintiffs had

27  "fail[ed] to demonstrate how the remedies under the [Texas law] are

28  more limited than those under California law."  Id. at 1163-64.

**United States District Court**
For the Northern District of California

1   Similarly, in <u>Medimatch</u>, another court in this district considered

2   a choice-of-law provision calling for the application of New Jersey

3   law.  120 F. Supp. 2d at 861-62.  In that case, the court observed

4   that the "[p]laintiffs cannot, and do not, argue that New Jersey

5   consumer protection law, if applied in California, would violate

6   the state's public policy toward consumers.  Indeed, plaintiffs

7   note in their briefing that the New Jersey CFA 'is intended to be

8   one of the strongest consumer protection laws in the nation.'"  <u>Id.</u>

9   at 862.  Neither of these decisions discussed whether a choice-of-

10  law provision should be enforced where the law of the chosen forum

11  offered substantially more limited remedies than those set out in

12  California law.

13      Hughes is apparently basing its argument on <u>Medimatch</u>'s

14  statement that "[t]he mere fact that the chosen law provides

15  greater or lesser protection than California law, or that in a

16  particular application the chosen law would not provide protection

17  while California law would, are not reasons for applying California

18  law."  <u>Id.</u> at 862; <u>Brazil</u>, 585 F. Supp. 2d at 1166 (quoting

19  <u>Medimatch</u>).[4]  This statement is undoubtedly true; however, where

20

21  ────────────────────
    [4] <u>Medimatch</u> cites the case of <u>Wong v. Tenneco</u>, 39 Cal. 3d 126, 135-

22  36 (1985), immediately after it states the quoted passage.  120 F.
    Supp. 2d at 861-62.  It then offers the following parenthetical

23  quotation from <u>Wong</u>: "[T]he standard is whether the chosen law is
    so offensive to California public policy as to be prejudicial to

24  recognized standards of morality and to the general interest of the
    citizens."  <u>Id.</u>; <u>Wong</u>, 39 Cal. 3d at 135-36.  When the California

25  Supreme Court made this statement in <u>Wong</u>, it was addressing a
    question of international comity: whether a California Court can be

26  enlisted to aid in the enforcement of a contract, the substance of
    which was illegal in the place where the contract was formed?  <u>Id.</u>

27  at 128.  It noted that there was a public policy exception that
    allowed California courts to enforce foreign contracts that were

28  illegal, so long as the laws that rendered them illegal were
    themselves offensive to California public policy.  <u>Id.</u> at 135-36.

                                    16

**United States District Court**
For the Northern District of California

1    another state's laws offer "greater or lesser protection" that runs

2    contrary to a "fundamental policy" of California, then California

3    law applies.  See Nedlloyd, 3 Cal. 4th at 466.  The question is

4    therefore not whether the California and Maryland laws are

5    "comparable," whether they cover the same conduct, or whether the

6    differences "merely" concern remedies.  Where a difference in

7    available remedies implicates a fundamental policy set out in

8    California law, the reviewing court must at least take pause before

9    it allows the parties to contract around those policies by choosing

10   to apply foreign law.

11       The punitive damages sought by Plaintiffs are permitted by the

12   CLRA, which explicitly states that "any waiver by a consumer of the

13   provisions of this title is contrary to public policy and shall be

14   unenforceable and void."  Cal. Civ. Code § 1751.  The CLRA appears

15   to authorize punitive damages to punish or deter offenders, and is

16   consistent with the legislature's intent to allow injured parties

17   to use portions of the CLRA to act as private attorneys general.

18   See Broughton v. Cigna Healthplans, 21 Cal. 4th 1066, 1080 (1999)

19   ("[T]he evident purpose of the injunctive relief provision of the

20   CLRA is not to resolve a private dispute but to remedy a public

21

22       This Court believes this standard would set the bar far too
     high in cases that address the enforceability of choice-of-law

23   provisions.  Indeed, there is no indication that either Brazil or
     Medimatch actually applied this remarkably high bar to the choice-

24   of-law provisions that they were considering.  The California
     Supreme Court has stated that the proper standard is whether a

25   "fundamental policy" is contravened.  Nedlloyd, 3 Cal. 4th at 466.
     There may be circumstances, like those presented in the current

26   case, where the law of another state is contrary to a fundamental
     policy of California, but where that law is not offensive to

27   recognized standards of morality.  California law reflects a
     measured policy decision to enlist injured citizens as private

28   attorneys general -- this may be a fundamental policy, even though
     alternative policy decisions need not be classified as "offensive."

1   wrong. . . .   In other words, the plaintiff in a CLRA damages

2   action is playing the role of a bona fide private attorney

3   general.").   The California Supreme Court has held that, in certain

4   contexts, the imposition of punitive damages may be "important to

5   the effectuation" of statutory policies, see Armendariz v. Found.

6   Health Psychcare Servs., Inc., 24 Cal. 4th 83, 103 (2000).[5]  Given

7   the CLRA's anti-waiver provision and role as a deterrent and check

8   on public harm, this Court concludes that punitive damages are in

9   fact a "fundamental" part of the statutory scheme.   The injunctive

10   relief authorized by the UCL and FAL raise similar policy concerns.

11   See id.   In contrast, the MCPA does not share the same spirit of

12   direct public action; it would allow Plaintiffs to sue to recover

13   their own damages, and it would require them to act indirectly

14   through state actors in order to receive equitable relief or

15   deterrence-based remedies.   See Citaramanis, 328 Md. at 150.

16   Because the MCPA would limit Plaintiffs to compensatory damages,

17   this Court finds that the choice-of-law provision in the Subscriber

18   Agreement conflicts with a fundamental policy set down in

19   California law.

20       In AOL, a California court of appeal refused to enforce both a

21   forum selection clause and a choice-of-law provision that entailed

22   the use of Virginia law, where plaintiffs alleged a CLRA violation.

23   90 Cal. App. 4th 1.   The court cited both the limited remedies

24   available under Virginia law (such as the lack of punitive damages

25

---

26   [5] At least one other court in this district has recently found that
    a statutory punitive damage provision in an employment

27   discrimination statute could not be circumvented by a choice-of-law
    provision that calls for the application of Canadian law.   Martin

28   v. D-Wave Sys., No. 09-3602, 2009 U.S. Dist. LEXIS 111561, *13-14
    (N.D. Cal. Dec. 1, 2009).

**United States District Court**
For the Northern District of California

1  or injunctive relief), as well as limitations on the class action

2  procedures that would be imposed upon the plaintiffs.  Id. at 15-

3  18.  While there is no indication that Maryland law would limit

4  Plaintiffs' ability to pursue this suit as a class action,

5  Plaintiffs would be unable to pursue punitive damages authorized by

6  the CLRA, and this Court is not satisfied that Plaintiffs would

7  have access to the equitable remedies they seek.  The imposition of

8  Maryland law would therefore probably not compromise Plaintiffs'

9  statutory rights to the same extent that the application of

10 Virginia law would have in AOL, but it would nevertheless implicate

11 fundamental policies of California.

12      Having established that California and Maryland law is

13 different in an important regard, this Court must next inquire

14 whether California has a "materially greater interest" than

15 Maryland in imposing its laws to resolve the current dispute.

16 Nedlloyd, 3 Cal. 4th at 466.  Hughes contends that Maryland has a

17 greater interest in "protecting Hughes' interest in having its

18 transactions uniformly governed by Maryland law."  Mot. at 20.

19 This Court disagrees.  California has a stronger interest in

20 protecting its consumers through its chosen mechanisms -- a

21 statutory scheme that permits its injured consumers not only to

22 bring class actions to recover their losses, but also to seek

23 punitive damages and injunctive relief in order to deter and

24 prevent future harm to other consumers located in the state.  The

25 fact that Maryland law, by and large, forbids the same conduct as

26 California's consumer protection laws actually undermines Hughes'

27 argument, because Maryland companies would presumably not be

28 required to alter their behavior to conform to both sets of laws.

**United States District Court**
For the Northern District of California

1   Maryland companies need only be mindful of the fact that, when

2   acting in California, they may be subject to the sharper teeth

3   embodied by California's consumer protection regime.  This Court

4   therefore concludes that this particular suit must be governed by

5   California law, at least with respect to Plaintiffs' UCL, FAL, and

6   CLRA claims.[6]

7      B.    **Whether Plaintiffs Have Stated a Claim Under the UCL,
            FAL, and CLRA**

8

9          As previously noted, Plaintiffs allege that Hughes violated

10  the CLRA by: (1) representing that its services have

11  characteristics which they do not have; (2) representing that its

12  services were of a particular standard or quality when they were of

13  another; (3) advertising its services with the intent to not sell

14  them as advertised; (4) advertising its services with the intent

15  not to supply reasonably expectable demand; (5) representing that a

16  transaction involves remedies that it does not, or which are

17  prohibited by law; (6)representing that a transaction has been

18  supplied in accordance with previous representations when it has

19  not been; and (7) inserting unconscionable provisions in the

20  Subscriber Agreement.  See Am. Compl. ¶¶ 77-79.  Plaintiffs' UCL

21  claims are based upon Hughes' alleged misrepresentations about its

22  services, as well as its use of the FAP and early cancellation

23

24  [6] The vast majority of Hughes' arguments regarding choice-of-law
    issues focuses exclusively on Plaintiffs' statutory causes of
25  action under the UCL, FAL, and CLRA.  It has cited to Maryland case
    law only with respect to two points in relation to other causes of
26  action, and on these issues the Court can find no material
    difference from the relevant California law.  Because Hughes and
27  Plaintiffs both rely primarily upon California and Ninth Circuit
    law, this Court does not address the question of whether Maryland
28  law should control Plaintiffs' nonstatutory causes of action, and
    proceeds to analyze these causes of action under California law.

fees.  Am. Compl. ¶ 91.

Hughes claims that all of Plaintiffs' causes of action fail to "state a claim for relief that is plausible on its face," Mot. at 7-11, and that those causes of action that sound in fraud do not state claims with sufficient particularity, as required by Rule 9(b) of the Federal Rules of Civil Procedure, id. at 11-14.  One need not plead fraud in order to state a claim under the CLRA, UCL, or FAL.  See Nordberg v. Trilegiant Corp., 445 F. Supp. 2d 1082, 1097 (N.D. Cal. 2006).  However, as the Ninth Circuit has observed:

> While fraud is not a necessary element of a claim under the CLRA and UCL, a plaintiff may nonetheless allege that the defendant engaged in fraudulent conduct.  A plaintiff may allege a unified course of fraudulent conduct and rely entirely on that course of conduct as the basis of that claim.  In that event, the claim is said to be 'grounded in fraud' or to 'sound in fraud,' and the pleading . . . as a whole must satisfy the particularity requirement of Rule 9(b).

Kearns v. Ford Motor Co., 567 F.3d 1120, 1125 (9th Cir. 2009) (quoting Vess, 317 F.3d at 1103-04).

### 1.   Allegations Related to Hughes' Representations of the Speed and Quality of its Services

The Court first addresses Plaintiffs' allegations related to Hughes' representations and advertisements regarding the speed and quality of its services, which comprise their claims under the UCL, FAL, and CLRA.[7]  As Plaintiffs are alleging that Hughes has made these misrepresentations intentionally to deceive its consumers,

---

[7] Plaintiffs allege causes of action for intentional and negligent misrepresentation or omission based on the same facts as their FAL, UCL and CLRA claims regarding the representation of services provided.  Am. Compl. ¶¶ 99-119.  Hughes has blended its analysis of the first four causes of action in much of its own briefing. The Court therefore does not separately address or analyze Plaintiffs' misrepresentation-based causes of action.

these allegations sound in fraud.  The Court nevertheless finds
that Plaintiffs have pled enough facts to state claims for relief
that are both particular and plausible on their face.

The Amended Complaint does more than merely claim that Hughes
was advertising that its services were "fast" while the services it
provided were "slow."  It specifically alleges that Schumacher was
unable to experience the speeds that Hughes had advertised its
service as reaching "up to," even during non-peak hours.  Am.
Compl. ¶ 65.  The Amended Complaint provides printouts of Hughes'
publications that state "typical" speeds during peak times, id. Ex.
B, but Schumacher claims that his average speeds during presumably
faster non-peak times actually fell within the stated "peak" range,
and that speeds during peak times were even slower than the
advertised "typical" peak speeds.  Am. Compl. ¶ 65.  Bayless claims
to have experienced average speeds that were slower than any of the
"typical" speeds published by Hughes, and that speeds for more
expensive plans were in fact slower than speeds for cheaper plans.
See id. ¶¶ 57, 58.  Both Bayless and Walter claim to have
frequently experienced slowdowns due to Hughes' FAP, and Walter
claims that she experienced these slowdowns even before she had
reached the applicable download thresholds.  Id. ¶¶ 57, 70.
Although the Amended Complaint does contain a large number of vague
and conclusory statements related to the speed and performance of
Hughes' networks, the allegations related to the individual
Plaintiffs' experiences are detailed, mutually supportive and, when
taken together, plausible enough to survive a motion to dismiss.

Hughes claims that it did not promise or represent that users
would achieve particular speeds or average speeds.  Mot. at 8-9.

22

**United States District Court**
For the Northern District of California

1    It similarly claims that no reasonable consumer would be misled by

2    their representations, and that many of the representations that

3    Plaintiffs identify are mere "puffery."  Id. at 14-17.  It is true

4    that Courts may sometimes dismiss claims of deceptive practices

5    where potentially deceptive language is tempered by the

6    juxtaposition of clear and unambiguous language that makes it

7    unlikely that a reasonable person may be deceived by the

8    representations.  See Freeman v. Time, Inc., 68 F.3d 285, 289-90

9    (9th Cir. 2007) (agreeing that "[i]t is clear from the exemplar

10   that no reasonable addressee could believe that the mailing

11   announced that the addressee was already the winner. . .").

12   However, the general rule is that whether the disparity between

13   actual services and representations about those services is

14   "deceptive" under the FAL, UCL, and CLRA is "a question of fact

15   which requires 'consideration and weighing of evidence from both

16   sides' and which usually cannot be made on demurrer."  See Linear

17   Technology Corp. v. Applied Materials, Inc., 152 Cal. App. 4th 115,

18   134-35 (Ct. App. 2007) (quoting McKell v. Wash. Mutual, Inc., 142

19   Cal. App. 4th 1457, 1472-73 (Ct. App. 2006)).

20       This Court believes that Plaintiffs' allegations are

21   sufficient to call into question Hughes' representations as to the

22   speed of its services, even when they are considered in light of

23   its representations about its "typical" speeds.  Hughes'

24   representations disclose hard, measurable quantities that cannot be

25   characterized as mere "puffery."  Plaintiffs claim that they were

26   often unable to reach even the "typical" speeds, and that the off-

27   peak speeds ended up being as slow as the advertised "typical"

28   speeds.  A reasonable jury could find that representations about

1    its internet services are deceptive even in light of Hughes'

2    disclosures that it could not guarantee any particular or average

3    speed.  Whether the experience of these Plaintiffs was unique, or

4    whether it was ultimately the result of lawful and non-deceptive

5    causes (such as a judicious application of the FAP) is a question

6    to be answered later.

7         Hughes also argues that actual reliance is an element of

8    fraud-based claims under the FAL, UCL and CLRA, and claims that

9    Plaintiffs have failed to plead the "who, what, when, where and

10   how" of the alleged misconduct.  Mot. at 12-13 (quoting Kearns, 567

11   F.3d at 1124, 1125-26).  Although Plaintiffs cite a number of

12   recent representations and advertisements, Hughes points out that

13   "all of the allegedly misleading statements identified by

14   plaintiffs were made years after plaintiffs signed up for the

15   Hughes service, making it impossible for plaintiffs to have relied

16   upon them."  Id. at 13.  The question is whether Plaintiffs can

17   meet their burden for pleading reliance without identifying the

18   particular advertisements or representations upon which they relied

19   when they entered or upgraded their service with Hughes.

20        The Court is satisfied that the pleadings in the Amended

21   Complaint are sufficiently particular to plead reliance.  Although

22   Plaintiffs have not cited specific advertisements that predate

23   their use of Hughes' services, each Plaintiff alleges that they

24   subscribed to Hughes' services based on Hughes' representations,

25   which (although roughly described) are comparable to the more

26   recent representations, which are alleged with greater

27   particularity.  Am. Comp. ¶¶ 56, 61, 69.  Plaintiffs are, in

28   essence, asking this Court to make an inference that Hughes'

**United States District Court**
For the Northern District of California

1    representations have been consistent over time in certain material

2    respects, dating back for the last several years.  Id.  The Court

3    finds this to be a reasonable inference.  Because Plaintiffs have

4    identified recent, particular representations from Hughes'

5    marketing campaign, and alleged that they relied on similar or

6    identical representations made at earlier times, Plaintiffs have

7    adequately notified Hughes of the claims against it.  Bly-Magee v.

8    California, 236 F.3d 1014, 1019 (9th Cir. 2001) (citation and

9    internal quotation marks omitted) ("To comply with Rule 9(b),

10   allegations of fraud must be specific enough to give defendants

11   notice of the particular misconduct which is alleged to constitute

12   the fraud charged so that they can defend against the charge and

13   not just deny that they have done anything wrong."); c.f. In re

14   Tobacco II Cases, 46 Cal. 4th 298, 328 (2009) ("[W]here, as here, a

15   plaintiff alleges exposure to a long-term advertising campaign, the

16   plaintiff is not required to plead with an unrealistic degree of

17   specificity that the plaintiff relied on particular advertisements

18   or statements.").

19       While Plaintiffs' pleadings are less particular regarding

20   Hughes' allegedly illegitimate use of the FAP, as well as its

21   theory that Hughes intentionally "oversold" its services by

22   providing services to more clients than it had the bandwidth to

23   support, the Court sees no harm in permitting Plaintiffs to proceed

24   with either of these arguments.  Both are potential explanations

25   for Plaintiffs' experiences with slow internet connections, and are

26   pled as elements that contribute to these slow speeds, rather than

27   as independent causes of action.  See Am. Compl. ¶ 43.  Both topics

28   will therefore be ripe for discovery, whether this Court construes

**United States District Court**
For the Northern District of California

1  them as independent theories of recovery or not.  When taken

2  together with Plaintiffs' allegations regarding their slow transfer

3  rates, the Court finds that these allegations present plausible

4  claims.[8]

5          2.   Allegations Related to Hughes' Termination Fees

6          Plaintiffs allege that Hughes' termination fees are unlawful

7  penalties under Civil Code sections 1671(c) and (d) ("§ 1671"), and

8  therefore "unlawful" under the UCL.  Am. Compl. ¶ 93.  Plaintiffs

9  claim that these fees are imposed "without any individualized

10  analysis of the actual damages incurred."  Id. ¶ 53.  Plaintiffs

11  liken the termination fees provision to a liquidated damages

12  provision.  See id. ¶ 93.  Under section 1671 of the California

13  Civil Code:

14          [In a] contract for the retail purchase, or
            rental, by such party of personal property or
15          services, primarily for the party's personal,
            family, or household purposes, . . . [¶] . . . a
16          provision in a contract liquidating damages for
            the breach of the contract is void except that
17          the parties to such a contract may agree therein
            upon an amount which shall be presumed to be the
18          amount of damage sustained by a breach thereof,
            when, from the nature of the case, it would be
19          impracticable or extremely difficult to fix the
            actual damage.

20

21  Cal. Civ. Code § 1671(c)-(d).

22          Hughes argues that Plaintiffs have failed to sufficiently

23  plead a claim that is plausible on its face, because "no pled facts

24  support [the] bald conclusion" that the provision violates

25  ────────────────────

26  [8] Plaintiffs' Amended Complaint includes brief allegations that
    Hughes "selectively block[s] certain types of connections,"
    including P2P connections.  Am. Compl. ¶ 3.  The Court notes that
27  Plaintiffs do not clearly or explicitly integrate this into a
    particular cause of action, or explain how it presents a basis for
28  recovery.  The Court therefore does not construe this as an
    independent theory of recovery.

26

California law.  Mot. at 10-11.  It faults Plaintiffs for not
pleading facts that indicate how the early termination fees are
actually applied in practice.  Id. at 11.

     This Court agrees that Plaintiffs have failed to allege a
plausible claim for violation of § 1671.  California courts have
defined "liquidated damages" as "an amount of compensation to be
paid in the event of a breach of contract, the sum of which is
fixed and certain by agreement . . . ."  See Chodos v. W. Publ.
Co., 292 F.3d 992, 1002 (9th Cir. 2002) (quoting Kelly v. McDonald,
98 Cal. App. 121, 125 (Ct. App. 1929)).  The allegations in the
Amended Complaint undermine the contention that the termination fee
set out in section 2.3 of the Subscriber Agreement is in fact a
claim for liquidated damages.  This provision states that customers
who terminate their subscription before the specified date "may be
subject [to] a termination fee of up to $700," but that the "exact
amount . . . is a function of when your account is terminated and
the type of Service Plan you are on."  Subscriber Agreement ¶ 2.3.
Although Plaintiffs allege that a "$400 fee is imposed without any
individualized analysis of the actual damages incurred," the
Amended Complaint only mentions a single specific application of
this provision, when Bayless was subject to a $300 fee.  Am. Compl.
¶¶ 53, 59.  This belies Plaintiffs' conclusory claim that the
termination fee was a fixed sum.  Plaintiffs have therefore failed
to allege that the Subscriber Agreement included a fixed fee that
constituted impermissible liquidated damages under § 1671.  C.f.
Ruwe v. Cellco P'ship, 613 F. Supp. 2d 1191, 1196, 1198 (discussing
requirement that liquidated damage provision include "fixed fee" to
maintain § 1671 claim).

United States District Court
For the Northern District of California

27

United States District Court
For the Northern District of California

Plaintiffs also allege that the fee is "unconscionable," and therefore in violation of the CLRA, which forbids "[i]nserting an unconscionable provision in the contract." Cal. Civ. Code § 1770(19). The term "unconscionable" "has both a procedural and a substantive element. The former takes into consideration the parties' relative bargaining strength and the extent to which a provision is 'hidden' or unexpected, while the substantive element requires terms that 'shock the conscience' or at the least may be described as 'harsh or oppressive.'" Trend Homes, Inc. v. Super. Ct., 131 Cal. App. 4th 950, 956 (Ct. App. 2005) (quoting Woodside Homes of California, Inc. v. Sup. Ct., 107 Cal. App. 4th 723, 727 (Ct. App. 2003). Plaintiffs simply state that the imposition of the fee was unconscionable, without explaining how it "shocked the conscience" or was "harsh or oppressive" at the time the agreements were entered into. Plaintiffs indicate that the $300 cancellation fee paid by Bayless was less than two-months worth of service charges at the time he made it. See Am. Compl. ¶¶ 58-59. Plaintiffs have not alleged that Hughes incurred no costs in providing their services, and "the fee may be viewed not only as a charge to recompense the [provider] for its costs incurred in [providing the services], but as a deferred fee for all of the services provided . . . in opening, maintaining, and terminating" the relationships between the parties. See Morris v. Redwood Empire Bancorp, 128 Cal. App. 4th 1305, 1323-24 (Ct. App. 2005) (dismissing unconscionability claim for bank termination fees). The "shock the conscience" standard is a high one, and Plaintiffs have simply not pled enough facts to support a claim for unconscionability.

**United States District Court**
For the Northern District of California

Finally, Plaintiffs contend that the termination fee provision is void because Hughes' duties under the contract are entirely illusory.  Am. Compl. ¶¶ 52, 129.  Plaintiffs allege that "the Subscriber Agreement does not commit HughesNet to *anything* with respect to internet service," because Hughes disclaims any representation that services will be "uninterrupted or operate at any minimum speed."  Id. ¶ 52 (emphasis in original) (quoting Subscriber Agreement ¶ 11.1).  "An illusory promise is one containing words in promissory form that promise nothing and which do not purport to put any limitation on the freedom of the alleged promisor."  Flores v. Am. Seafoods Co., 335 F.3d 904, 912 (9th Cir. 2003).  "Under California law, an obligation under a contract is not illusory if the obligated party's discretion must be exercised with reasonableness or good faith."  Milenbach v. Comm'r, 318 F.3d 924, 930 (9th Cir. 2003).  The Court rejects Plaintiffs' extreme reading of the Subscriber Agreement -- no reasonable person would conclude that the contract did not bind Hughes to provide at least some minimal level of internet-related services.  The mere fact that the contract permitted Hughes an unspecified level of interruption or poor transfer rates does not render Hughes' obligations illusory.

The Court therefore DISMISSES the first cause of action for violation of the CLRA only with respect to Plaintiffs' allegations regarding the termination fees.  The Court also DISMISSES the second cause of action for violation of the FAL and UCL, only with respect to Plaintiffs' allegations regarding Hughes' termination fees.  Although the Court finds that Plaintiffs have not adequately pled that the termination fee provision, in and of itself, gives

**United States District Court**
For the Northern District of California

1   rise to independent causes of action, the Court makes no judgment

2   at this time as to whether the termination fees paid by Plaintiffs

3   may be cognizable as damages under their other theories of

4   recovery.

5       **C.   Money Had and Received**

6       Plaintiffs' fifth cause of action is for money had and

7   received.  Am. Compl. ¶¶ 120-26.  "The foundation of an action for

8   conversion on a money had and received count is the unjust

9   enrichment of the wrongdoer, and in order for plaintiff to recover

10  in such action she must show that a definite sum, to which she is

11  justly entitled, has been received by defendant."  <u>Bastanchury v.</u>

12  <u>Times-Mirror Co.</u>, 68 Cal. App. 2d 217, 236 (Ct. App. 1945).  A

13  plaintiff must plead that the defendant "is indebted to the

14  plaintiff in a certain sum for money had and received by the

15  defendant for the use of the plaintiff."  <u>Schultz v. Harney</u>, 27

16  Cal. App. 4th 1611, 1623 (1994) (citation and internal quotation

17  marks omitted).  "The cause of action is available where . . . the

18  plaintiff has paid money to the defendant pursuant to a contract

19  which is void for illegality."  <u>Id.</u>

20      Plaintiffs base their claim for money had and received upon

21  the allegation that "HughesNet has become indebted to Plaintiff

22  [sic] and class members in the amount of early termination fees

23  paid during that period and such other amounts which may have been

24  acquired by means of any practice found by this Court to be

25  illegal, unfair or deceptive . . . ."  Am. Compl. ¶ 122.  This

26  fails to state a "definite sum" to which Plaintiffs are justly

27  entitled.  The Court has already determined that Plaintiffs have

28  failed to state an independent cause of action based on the

**United States District Court**
For the Northern District of California

1  termination fee provision in the Subscriber Agreement.  Plaintiffs

2  have not otherwise alleged that the relevant portions of the

3  Subscriber Agreement were void.  They cite no authority for the

4  proposition that money received as a result of deceptive

5  advertising practices can be recoverable under a theory of money

6  had and received.  Consequently, this cause of action is DISMISSED.

7      **D.**   **Declaratory Relief**

8      As Plaintiffs' sixth cause of action, they request declaratory

9  relief, and ask this Court to determine the rights and obligations

10  of the parties under the Subscriber Agreement.  Am. Compl. ¶¶ 127-

11  31.  This Court has already addressed most of the bases upon which

12  Plaintiffs request declaratory relief: It has concluded that

13  Hughes' obligations under the contract were not illusory, and it

14  has declined to address the arbitration and anti-class action

15  provisions as there is currently no controversy between the parties

16  with respect to these issues.  The Court has further found that

17  Plaintiffs have not alleged a basis for voiding the termination-fee

18  provision.

19      Plaintiffs allege that "HughesNet's failure to provide service

20  reasonably consistent with its advertisements and promises excused

21  any further performance by class members."  Id. ¶ 129b.  The

22  Amended Complaint does not attempt to allege that Hughes had

23  undertaken a duty to provide internet services at any particular

24  speed (in fact, it alleges quite the opposite, see id. ¶ 52), or

25  that Hughes' slow service speeds were so unreasonable as to

26  constitute a breach of the Subscriber Agreement.  If Plaintiffs

27  seek a finding that they are excused from performance due to

28  Hughes' nonperformance, they must clearly allege facts that are

suggestive of Hughes' breach of contract.  Based on this Court's reading of the Subscriber Agreement, Plaintiffs do not allege that slow connection speeds alone amounted to nonperformance on Hughes' part.[9]  Plaintiffs' sixth cause of action is therefore DISMISSED.

**V.   CONCLUSION**

The Court hereby GRANTS IN PART and DENIES IN PART Hughes' Motion to Dismiss.  The Court DENIES Hughes' Motion to Dismiss Plaintiffs' first and second causes of action, except that the Court hereby STRIKES Plaintiffs' allegations regarding the illegality of Hughes' termination fees.  Plaintiffs have leave to amend their allegations regarding Hughes' termination fees.  The Court DENIES Hughes' Motion to Dismiss Plaintiffs' third and fourth causes of action.  Plaintiffs' fifth and sixth causes of action are DISMISSED WITHOUT PREJUDICE.

Should Plaintiffs choose to submit a second amended complaint, it must be submitted no later than thirty (30) days after the date of this Order.


IT IS SO ORDERED.


Dated: January 26, 2010

UNITED STATES DISTRICT JUDGE

---

[9] This is, of course, a question that is wholly separate from the question of whether the slow performance of Hughes' services rendered their contrary representations and advertisements deceptive or fraudulent.

United States District Court
For the Northern District of California