1

2

3

4                    IN THE UNITED STATES DISTRICT COURT

5                   FOR THE NORTHERN DISTRICT OF CALIFORNIA

6

7    TINA WALTER, CHRISTOPHER BAYLESS   ) Case No. 09-2136 SC
     and ERIC SCHUMACHER, individually  )
8    and on behalf of all others        ) ORDER GRANTING IN PART AND
     similarly situated,                ) DENYING IN PART MOTION TO
9                                        ) DISMISS
                                         )
10             Plaintiffs,               )
                                         )
11        v.                             )
                                         )
12   HUGHES COMMUNICATIONS, INC., and    )
13   HUGHES NETWORK SYSTEMS, LLC,        )
                                         )
14             Defendants.               )
                                         )
15   ──────────────────────────────────

16   **I.    INTRODUCTION**

17        Plaintiffs Tina Walter ("Walter"), Christopher Bayless

18   ("Bayless") and Eric Schumacher ("Schumacher") (collectively,

19   "Plaintiffs") have brought this purported class action lawsuit

20   against their internet provider for supplying internet services

21   that, they allege, are significantly slower than advertised.  See

22   Am. Consolidated Class Action Compl. ("Am. Compl."), Docket No. 18.

23   The internet provider, comprised of Hughes Communications, Inc.,

24   and Hughes Network Systems, LLC (collectively, "Hughes" or

25   "HughesNet"), has filed a Motion to Dismiss ("Motion").  Docket No.

26   20.  The Motion is fully briefed.  See Docket Nos. 30 ("Opp'n"), 37

27   ("Reply").  Having considered all of the briefs submitted by the

28   parties, the Court concludes that this Motion is suitable for

United States District Court
For the Northern District of California

resolution without oral argument.  For the reasons stated below, Hughes' Motion is GRANTED IN PART and DENIED IN PART.

## II.  BACKGROUND

Both Hughes Communications, Inc., and Hughes Network Systems, LLC, are Delaware corporations, with their principal place of business in Germantown, Maryland.  Am. Compl. ¶¶ 9-10.  Hughes is a satellite broadband internet service provider, which supplies internet access to its customers via satellite.  Id. ¶ 1.  Because this service does not require cable or phone wires, Hughes is able to offer its services to consumers located in remote areas where other broadband services are generally unavailable.  Id. ¶¶ 1, 29.  Plaintiffs are each California residents who have purchased various services from Hughes, and have found these services to be lacking.  Id. ¶¶ 56-72.  Plaintiffs seek to represent the estimated 80,000 California citizens who have subscribed to Hughes' services during the four-year period prior to the filing of this action.  Id. ¶¶ 13, 16.[1]

### A.  Allegations Related to Hughes' Advertising

As a provider of broadband internet services, Hughes has marketed its services by representing the high speeds and data transfer rates of the internet connections that it offers.  It provides a variety of services at different speeds and prices, such as "residential plans [that] offer speeds up to 1.5 megabits and start at $59.99 per month.  Small-business plans start at $99.99

---

[1] Plaintiffs also seek to include a subclass of "consumers" as defined by California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1761(d), who were Hughes' subscribers in the three years prior to filing this action.  Am. Compl. ¶ 14.

United States District Court
For the Northern District of California

per month and offer maximum speeds of up to 2 megabits per second." Id. Ex. A ("Aug. 1, 2006 Newsletter") at 1.  On its website, Hughes advertises that its services will allow its users to "download Web pages quickly and ensure timely email delivery."  Id. Ex. B ("Pl.s' Printout of Hughes Website") at 1.  It claims to offer "super-fast, satellite Internet access" with "no dialing in, no waiting and no tied-up phone lines.  You can download files in seconds, check email instantly and surf faster than you ever imagined."  Id. at 2. According to the website, the connection is "up to 30x faster than dial-up," allows users to "[f]lip through Web pages like turning the pages of a book," and "[d]ownload large files in minutes, not hours."  Id. at 3.

    As Hughes points out, its website also includes a page that describes the "[s]peeds you can expect" from its services. Mitchell Decl. Ex. A ("Hughes Printout of Hughes Website") at 1-2.[2] This section states that data transfer speeds "will vary based on a variety of factors including the configuration of your computer, the number of concurrent users, network or Internet congestion, the speed of the Websites you are accessing, and other factors.  Stated speeds and uninterrupted use of service are not guaranteed."  Id.

_____

[2] Christopher Mitchell, counsel for Hughes, submitted a declaration in support of the Motion, Docket No. 21, which attached a printout of Hughes' website.  Hughes has submitted a Request for Judicial Notice, Docket No. 22, which refers to this printout.  Plaintiffs have cited and described various portions of Hughes' website throughout their Complaint, and they have not questioned the authenticity of the printout submitted by Hughes.  See al-Kidd v. Ashcroft, 580 F.3d 949, 955 n.6 (9th Cir. 2009) (taking judicial notice of entire contents of document cited in complaint and available online).  The Court notes that the Amended Complaint appears to specifically describe the portion of the website that Hughes has submitted.  Am. Compl. ¶¶ 37, 49-50.  Considering the Amended Complaint's direct references to this portion of the website, the Court finds that it may consider the printout without converting this Motion into a motion for summary judgment.

It describes each particular plan that is available to its customers, including the Home service plan ("download speeds of up to 1.0 Mbps, with typical speeds of about 550 Kbps to 650 Kbps during peak times") and Pro plan ("download speeds of up to 1.2 Mbps, with typical speeds about 700 Kbps to 800 Kbps during peak times"), all the way up to its ElitePremium Plan ("maximum download speeds of up to 5 Mbps, with typical speeds about 2.7 to 3 Mbps during peak times").[3]  <u>Id.</u> at 3.

> **B.   <u>Allegations Related to Hughes' Performance and Service Practices</u>**

Plaintiffs claim that "[i]n reality, HughesNet customers consistently receive slow and spotty service that falls woefully short of the fanciful claims" set forth in Hughes' website and advertisements, and that Hughes' "service during peak times generally performs at speeds lower even than what HughesNet states are 'typical' speeds . . . ."  Am. Compl. ¶¶ 36-37.  Plaintiffs claim that slow speeds extend into non-peak, low volume periods.  <u>Id.</u> ¶ 44.  Plaintiffs allege that Hughes' advertising statements were "meant to[] and did induce the Class [to] enter[] into agreements for HughesNet's satellite internet service," and that Hughes encourages its customers to upgrade to more expensive services to obtain faster transfer speeds.  <u>Id.</u> ¶¶ 38-39.

Plaintiffs allege that the slow speeds of Hughes' services are the result of Hughes' practice of "oversell[ing] and/or cap[ping] its customers' internet services such that the actual speeds

---

[3] The abbreviations "Mbps" and "Kbps" stand for megabits per second and kilobits per second, respectively.  Each megabit is equivalent to about 1000 kilobits.  Consequently, the "typical" speeds disclosed above are roughly 55% to 65% as fast as the download speeds that these connections can get "up to."

<div style="text-align:left;font-weight:bold;">United States District Court<br>For the Northern District of California</div>

obtainable under any of the respective service plans is substantially and systematically slower than is advertised." Id. ¶ 41.  Plaintiffs also allege that Hughes blocks its users from making certain connections, namely Peer-to-Peer (P2P) connections. Id. ¶¶ 3.f, 42.  Finally, Plaintiffs allege that Hughes implements a "Fair Access Policy" ("FAP") that limits the amount of data that its users may transfer, and which permits Hughes to temporarily reduce a customer's transfer speeds when the customer downloads an amount of data over a short period of time in excess of certain download thresholds.  Id. ¶¶ 46-47.  Plaintiffs claim that "HughesNet's description of and disclosures about the FAP are misleading" because it states that "a small percentage of subscribers who exceed [the threshold] will experience a temporary reduction of speed," while in fact "a large percentage of subscribers experience lengthy shutdowns if they exceed the FAP threshold, sometimes for days at a time."  Id. ¶ 48.

**C.   Allegations Related to Provisions in Hughes' Subscriber Agreement**

Plaintiffs' Amended Complaint does not stop at the description of the services that Hughes provides its subscribers; it also describes an allegedly illegal termination fee that Hughes imposes when its customers attempt to end their service before the expiration of Hughes' two-year contracts.  Id. ¶ 53.  The Subscriber Agreement states:

> In the event you cancel your subscription to the Service prior to the expiration of the minimum commitment period specified for your applicable service plan, you may be subject [to] a termination fee of up to $700.  The exact amount of termination charges which will apply is a function of when your account is terminated and

**United States District Court**
For the Northern District of California

1    the type of Service Plan you are on.

2  Id. Ex. D ("Subscriber Agreement") ¶ 2.3.

3    Plaintiffs describe Hughes' practices as follows:  "HughesNet

4  unilaterally imposes early termination penalties of hundreds of

5  dollars on [customers who terminate their services early], under

6  purported authority of the Subscriber Agreement.  The $400 fee is

7  imposed without any individualized analysis of the actual damages

8  incurred, and even in cases in which HughesNet materially breached

9  the terms of its agreement."  Id. ¶ 53.

10    Plaintiffs also refer to the Subscriber Agreement's provision

11 requiring arbitration of all disputes and a "waiver of any class

12 action arbitration," as well as a requirement that all disputes be

13 resolved under Maryland law.  Id. ¶ 54.  The provision reads, in

14 pertinent part, as follows:

15        This Agreement and all of the parties' respective
          rights  and  duties  in  connection  herewith,
16        including,  without  limitation,  claims  for
          violation  of  state  consumer  protection  laws,
17        unfair  competition  laws,  and  any  claims  in  tort
          shall be governed by and construed in accordance
18        with  the  laws  of  the  State  of  Maryland,  in  the
          United  States,  excluding  its  conflicts  of  laws
19        provisions.  Any such controversy or claim shall
          be settled by arbitration, and administered by
20        the  American  Arbitration  Association  under  its
          Commercial  Arbitration  Rules. . . .  There  shall
21        be  no  class  action  arbitration  pursuant  to  this
          Agreement.

22

23 Subscriber Agreement ¶ 16.  Notably, Hughes has not sought to

24 invoke the arbitration or anti-class action portions of this

25 provision against Plaintiffs, although it has insisted on the

26 exclusive applicability of Maryland law.  Mot. at 17-21.

27    **D.   Individual Plaintiffs' Experiences**

28    Bayless subscribed to Hughes' "Pro" service plan, which Hughes

6

represented could provide "up to 1.2Mbps/200Kbps in download/upload speed" in December of 2005, and upgraded to the "ProPlus" service plan (up to 1.6 Mbps) in November of 2006. Am. Compl. ¶ 56.  He experienced frequent service interruptions and slowdowns, and found that he was sometimes subject to slowdowns implemented under the FAP.  Id. ¶ 57.  He states that his average speeds were approximately 450 Kbps.  He eventually upgraded to the $179.00 per month "ElitePlus" plan (up to 3 Mbps, which he states was advertised as providing minimum speeds of 1.2 Mbps).  Id. ¶ 58.  He found the speeds to be "approximately half those promised or advertised," and even "worse than they had been on the cheaper ProPlus plan."  Id.  He terminated his service in November of 2008 and paid a $300.00 cancellation fee.  Id. ¶ 59.

Schumacher first signed up for a "TwoWay Service" plan with Hughes in April of 2004, for $59.99 per month.  Id. ¶ 60.  He upgraded to the slightly more expensive "Pro" plan ($69.00 per month for up to 1.2 Mbps) after experiencing slow service.  Id. ¶¶ 61-62.  Even though this service is advertised as achieving "typical" speeds of "about 700 Kbps to 800 Kbps during peak times," Hughes Printout of Hughes Website at 2, Schumacher clocked the speed of his connection "on hundreds of occasions," and found that "[a]t no time during non-peak hours did he ever achieve a download speed of 1.2 Mbps.  The average speed he achieved during non-peak hours was 767 Kbps."  Am. Compl. ¶ 65. (emphasis in original).  The average download speed for both peak and non-peak hours was 651 Kbps.  Id.  Schumacher upgraded to the "Small Office" plan in March of 2008 (up to 1.5 Mbps), found the service unsatisfactory, and terminated his service in or around January of 2009.  Id. ¶¶ 66-68.

**United States District Court**
For the Northern District of California

Walter subscribed to the "Home" service plan in June or July of 2006.  She experienced slow transfer speeds and found that the "FAP was implement[ed] more stringently than the disclosures to her had represented."  <u>Id.</u> ¶ 70.  She claims that the network began to slow even "before she reached the represented data threshold" set out by the FAP.  <u>Id.</u>  She eventually switched to the "Pro" plan ($69.00 per month for 1.2 Mbps) and later to the "Elite" plan (2 Mbps for $119.99 per month).  <u>Id.</u>  She frequently experienced speeds below the "typical" speeds advertised by Hughes, even during non-peak times.  <u>Id.</u> ¶¶ 71-72.

Plaintiffs have asserted six causes of action, including: (1) violation of the California Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750 <u>et</u> <u>seq.</u>; (2) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 <u>et</u> <u>seq.</u>, and California's False Advertising Law ("FAL"), <u>id.</u> §§ 17500 <u>et</u> <u>seq.</u>; (3) negligent misrepresentation and omission; (4) intentional misrepresentation and omission; (5) money had and received; and (6) declaratory relief.  <u>Id.</u> ¶¶ 73-131.  They filed this action against Hughes in this Court in May of 2009, asserting diversity jurisdiction.  <u>Id.</u> ¶ 11.

### III. <u>LEGAL STANDARD</u>

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim."  <u>Navarro v. Block</u>, 250 F.3d 729, 732 (9th Cir. 2001).  Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory.  <u>Balistreri v. Pacifica Police Dep't</u>, 901 F.2d 696, 699 (9th Cir.

**United States District Court**
For the Northern District of California

1990).  Allegations of material fact are taken as true and
construed in the light most favorable to the nonmoving party.
Cahill v. Liberty Mutual Ins. Co., 80 F.3d 336, 337-38 (9th Cir.
1996).  Although well-pleaded factual allegations are taken as
true, a motion to dismiss should be granted if the plaintiff fails
to proffer "enough facts to state a claim for relief that is
plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544,
547 (2007).  The court need not accept as true legal conclusions
couched as factual allegations.  Ashcroft v. Iqbal, 129 S.Ct. 1937,
1949-50 (2009).  "Threadbare recitals of the elements of a cause of
action, supported by mere conclusory statements, do not suffice."
Id. at 1949.

    Where plaintiffs allege fraud, or conduct that is sufficiently
"grounded in fraud," they must plead their claim with particularity
as required by Rule 9(b) of the Federal Rules of Civil Procedure.
See Edwards v. Marin Park, Inc., 356 F.3d 1058, 1065-66 (9th Cir.
2004); Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1106 (9th Cir.
2003).  Plaintiffs must include "the who, what, when, where, and
how" of the fraud.  Vess, 317 F.3d at 1106 (citations omitted).  A
plaintiff satisfies the particularity requirement only if his or
her allegations are "specific enough to give defendants notice of
the particular misconduct which is alleged to constitute the fraud
charged so that they can defend against the charge and not just
deny that they have done anything wrong."  Bly-Magee v. California,
236 F.3d 1014, 1019 (9th Cir. 2001) (citation and internal
quotation marks omitted).
///
///

**United States District Court**
For the Northern District of California

**IV.   DISCUSSION**

    **A.   Choice of Law**

    Hughes argues that Plaintiffs' first and second causes of action, for violation of the CLRA, UCL and FAL, must be dismissed because the parties agreed by contract that Maryland law would be applied to resolve any dispute between them related to Hughes' services.  Mot. at 17-21.  By accepting the Subscriber Agreement, Plaintiffs agreed to have all of their "respective rights and duties in connection" with their service agreements, "including, without limitation, claims for violation of state consumer protection laws, unfair competition laws, and any claims in tort . . . governed by and construed in accordance with the laws of the State of Maryland . . . ."  See Subscriber Agreement ¶ 16. Plaintiffs argue that this Court should refrain from applying Maryland law because "Maryland consumer law in general conflicts with California's pro-consumer statutes and policies."  Opp'n at 17-23.  As a federal court sitting in diversity, this Court must apply California's choice-of-law principles to determine whether to enforce the Subscriber Agreement's choice-of-law provision.  See Estate of Darulis v. Garate, 401 F.3d 1060, 1062 (9th Cir. 2005).

    In opposing enforcement of the choice-of-law provision in the Subscriber Agreement, Plaintiffs have focused primarily upon the arbitration clause and the bar upon class action arbitration.  Id. at 17-20.  While California courts have long recognized consumers' protected rights to bring class actions under California's various consumer protection statutes, see, e.g., Am. Online, Inc., v. Super. Ct., 90 Cal. App. 4th 1, 17-18 (Ct. App. 2001) (hereinafter "AOL"), Hughes has not actually sought to enforce these provisions

against Plaintiffs, and there is no indication that Hughes intends to do so in the future.  "[A] separate conflict of laws inquiry must be made with respect to each issue in the case." Wash. Mutual Bank, FA v. Super. Ct., 24 Cal. 4th 906, 920 (Ct. App. 2001).  At this point, the Court sees no reason to adjudicate the as-of-yet hypothetical dispute regarding the enforceability of the arbitration and anti-class-action provisions.  "Accordingly, the Court finds that the issues raised by the arbitration provision are irrelevant to the issue currently presented; if defendant seeks to compel arbitration, the Court will conduct a separate choice-of-law analysis on that issue." Dajani v. Dell, Inc., No. 08-5285, 2009 U.S. Dist. LEXIS 30194, *6-7 (N.D. Cal. Mar. 26, 2009) (declining to resolve allegations regarding unenforced arbitration provision, but addressing choice-of-law provision).

Under California law, where a contractual clause could have the effect of waiving legal protections that are afforded by California law and protected by an antiwaiver provision, the party seeking enforcement has the burden of proof. AOL, 90 Cal. App. 4th at 10-11.  Plaintiffs' first cause of action raises issues under the CLRA, which includes an express antiwaiver provision stating that "[a]ny waiver by a consumer of the provisions of this title is contrary to public policy and shall be unenforceable and void." Cal. Civ. Code § 1751.  Hughes therefore has the burden of proving that the choice-of-law provision is enforceable.  See AOL, 90 Cal. App. 4th at 10-11 (finding that party seeking enforcement held burden of proof, where opposing party had brought claims under CLRA and UCL).

California follows the Restatement Second of Conflict of Laws

1  ("Restatement"), "which reflects a strong policy favoring

2  enforcement of such provisions." Nedlloyd Lines B.V. v. Super.

3  Ct., 3 Cal. 4th 459, 464-65 (1992).  As the California Supreme

4  Court has paraphrased, courts must first "determine either: (1)

5  whether the chosen state has a substantial relationship to the

6  parties or their transaction or (2) whether there is any other

7  reasonable basis for the parties' choice of law." Id. at 466

8  (citing Restatement § 187(2)).  "If one of the parties resides in

9  the chosen state, the parties have a reasonable basis for their

10  choice."  Id. at 467 (quoting Consul Ltd. v. Solide Enterprises,

11  Inc., 802 F.2d 1143, 1147 (9th Cir. 1986)).  Plaintiffs concede

12  that Hughes' principal place of business is located in Maryland,

13  Am. Compl. ¶¶ 9-10, and there can therefore be no reasonable

14  dispute over whether the parties had a substantial relationship

15  with the chosen state.  See Nedlloyd, 3 Cal. 4th at 467.

16      "[T]he Court must next determine whether the chosen state's

17  law is contrary to a *fundamental* policy of California.  If there is

18  no such conflict, the court shall enforce the parties' choice of

19  law."  Id. at 466 (emphasis in original).  "The mere fact that the

20  chosen law provides greater or lesser protection than California

21  law, or that in a particular application the chosen law would not

22  provide protection while California law would, are not reasons for

23  applying California law." Medimatch, Inc. v. Lucent Techs., Inc.,

24  120 F. Supp. 2d 842, 861-62 (N.D. Cal. 2000).  Hughes argues that

25  enforcing the laws of Maryland would not be contrary to a

26  fundamental policy of California because Maryland's consumer

27  protection laws offer "comparable protections."  Mot. at 19.  They

28  refer to the Maryland Consumer Protection Act ("MCPA"), Md. Code

**United States District Court**
For the Northern District of California

1   Ann., Com. Law §§ 13-101 et seq.  Id.  It states that it is "not

2   materially different from [] the analogous California consumer

3   protection[] statutes," and cites several cases that have made

4   similar observations.  Id.

5        This Court agrees that activities prohibited by the MCPA are

6   nearly identical to those forbidden by the CLRA.  Plaintiffs allege

7   that Hughes violated seven provisions of the CLRA: it represented

8   that its services have characteristics which they do not have, Cal.

9   Civ. Code § 1770(a)(5); it represented that its services were of a

10  particular standard or quality when they were of another, id.

11  § 1770(a)(7); it advertised its services with the intent to not

12  sell them as advertised, id. § 1770(a)(9); it advertised its

13  services with the intent not to supply reasonably expectable

14  demand, id. § 1770(a)(10); it misrepresented that it had delivered

15  the promised services, id. § 1770(a)(14); and it inserted

16  unconscionable provisions or improper remedies in the Subscriber

17  Agreement, id. § 1770(a)(16), (a)(19).  See Am. Compl. ¶¶ 77-79.

18  Each of these provisions, except for the provision related to

19  unconscionable contract provisions or remedies, can be paired with

20  an arguably analogous prohibition in the MCPA.  See MCPA § 13-

21  301(2)(i), (2)(iv), (5)(i)-(ii), 9(iii).  Plaintiffs' UCL claims

22  are based upon Hughes' alleged misrepresentations about its

23  services, as well as its use of the FAP and early cancellation

24  fees.  Am. Compl. ¶ 91.  Hughes does not explain precisely how each

25  of these claims could be cognizable under the MCPA, but this Court

26  will assume, arguendo, that Maryland law creates causes of actions

27  that are comparable to those of California.  The Court is satisfied

28  that Maryland law prohibits roughly the same conduct as that

1  prohibited under California law.

2      As Plaintiffs point out, the greatest difference between

3  California and Maryland law appears to be in the remedies that are

4  available to plaintiffs.  The CLRA permits plaintiffs to recover

5  both actual damages and punitive damages, to obtain equitable

6  relief enjoining illegal acts or practices of defendants, and to

7  seek any other relief that the court deems proper.  Cal. Civ. Code

8  § 1780(a).  In contrast, the remedy set out by the MCPA "is purely

9  compensatory; it contains no punitive component.  Indeed, any

10  punitive assessment under the [M]CPA is accomplished by an

11  imposition of a civil penalty recoverable by the State under § 13-

12  410, as well as by criminal penalties imposed under § 13-411.

13  Thus, in determining the damages due the consumer, we must look

14  only to his actual loss or injury caused by the unfair or deceptive

15  trade practices."  Golt v. Phillips, 308 Md. 1, 12 (1986); see also

16  MCPA § 13-408(a) ("[A]ny person may bring an action to recover for

17  injury or loss sustained by him as the result of a practice

18  prohibited by this title.").  The MCPA allows no punitive damages,

19  because its private enforcement provision "was not intended to

20  punish [defendants] or set an example for similar wrongdoers."

21  Citaramanis v. Hallowell, 328 Md. 142, 154 (1992).

22      Similarly, the UCL and FAL both permit injunctive relief.

23  Cal. Bus. & Prof. Code §§ 17203, 17535.  Hughes has not commented

24  on whether the MCPA would provide Plaintiffs an opportunity to seek

25  injunctive relief of the kind permitted by California law.  This

26  Court's own reading of the statute is that it would not.  See MCPA

27  § 13-406 (allowing attorney general to seek injunction; making no

28  mention of private plaintiffs); see also Citaramanis, 328 Md. at

14

1    150 ("[T]he [M]CPA's public enforcement mechanisms are set up to

2    prevent potentially unfair or deceptive trade practices from

3    occurring, even before any consumer is injured, whereas § 13-408(a)

4    requires that actual 'injury or loss' be sustained by a consumer

5    before recovery of damages is permitted in a private cause of

6    action.").

7        Hughes' only response is to perfunctorily dismiss the

8    differences between California and Maryland law as merely

9    concerning remedies, stating that "[t]he relevant question is not

10   whether Maryland law provides exactly the same *remedies* as the UCL

11   and CLRA, but rather whether the MCPA offers comparable *substantive*

12   *protections* and covers the same *conduct* as the California

13   statutes."  Reply at 13 (emphasis in original).  To support this

14   proposition, Hughes cites two cases from the Northern District of

15   California: Medimatch, 120 F. Supp. 2d 842, and Brazil v. Dell,

16   Inc., 585 F. Supp. 2d 1158 (N.D. Cal. 2008).  Neither of these

17   cases support Hughes' proposition that a difference between the

18   laws of two states cannot be "fundamental" merely because it is a

19   difference in available remedies.

20       Brazil involved a consumer dispute under the UCL, FAL and

21   CLRA, in which the plaintiffs had assented to a choice-of-law

22   provision that required disputes to be resolved in accordance with

23   the law of Texas.  585 F. Supp. 2d at 1161.  The district court

24   noted that Texas law differed from California law in certain minor

25   respects, but found Texas law to be largely analogous in all

26   important respects, and specifically found that the plaintiffs had

27   "fail[ed] to demonstrate how the remedies under the [Texas law] are

28   more limited than those under California law."  Id. at 1163-64.

**United States District Court**
For the Northern District of California

1    Similarly, in Medimatch, another court in this district considered

2    a choice-of-law provision calling for the application of New Jersey

3    law.  120 F. Supp. 2d at 861-62.  In that case, the court observed

4    that the "[p]laintiffs cannot, and do not, argue that New Jersey

5    consumer protection law, if applied in California, would violate

6    the state's public policy toward consumers.  Indeed, plaintiffs

7    note in their briefing that the New Jersey CFA 'is intended to be

8    one of the strongest consumer protection laws in the nation.'"  Id.

9    at 862.  Neither of these decisions discussed whether a choice-of-

10   law provision should be enforced where the law of the chosen forum

11   offered substantially more limited remedies than those set out in

12   California law.

13        Hughes is apparently basing its argument on Medimatch's

14   statement that "[t]he mere fact that the chosen law provides

15   greater or lesser protection than California law, or that in a

16   particular application the chosen law would not provide protection

17   while California law would, are not reasons for applying California

18   law."  Id. at 862; Brazil, 585 F. Supp. 2d at 1166 (quoting

19   Medimatch).[4]  This statement is undoubtedly true; however, where

20

21   _____

     [4] Medimatch cites the case of Wong v. Tenneco, 39 Cal. 3d 126, 135-

22   36 (1985), immediately after it states the quoted passage.  120 F.
     Supp. 2d at 861-62.  It then offers the following parenthetical

23   quotation from Wong: "[T]he standard is whether the chosen law is
     so offensive to California public policy as to be prejudicial to

24   recognized standards of morality and to the general interest of the
     citizens."  Id.; Wong, 39 Cal. 3d at 135-36.  When the California

25   Supreme Court made this statement in Wong, it was addressing a
     question of international comity: whether a California Court can be

26   enlisted to aid in the enforcement of a contract, the substance of
     which was illegal in the place where the contract was formed?  Id.

27   at 128.  It noted that there was a public policy exception that
     allowed California courts to enforce foreign contracts that were

28   illegal, so long as the laws that rendered them illegal were
     themselves offensive to California public policy.  Id. at 135-36.

**United States District Court**
For the Northern District of California

another state's laws offer "greater or lesser protection" that runs contrary to a "fundamental policy" of California, then California law applies.  See Nedlloyd, 3 Cal. 4th at 466.  The question is therefore not whether the California and Maryland laws are "comparable," whether they cover the same conduct, or whether the differences "merely" concern remedies.  Where a difference in available remedies implicates a fundamental policy set out in California law, the reviewing court must at least take pause before it allows the parties to contract around those policies by choosing to apply foreign law.

The punitive damages sought by Plaintiffs are permitted by the CLRA, which explicitly states that "any waiver by a consumer of the provisions of this title is contrary to public policy and shall be unenforceable and void."  Cal. Civ. Code § 1751.  The CLRA appears to authorize punitive damages to punish or deter offenders, and is consistent with the legislature's intent to allow injured parties to use portions of the CLRA to act as private attorneys general. See Broughton v. Cigna Healthplans, 21 Cal. 4th 1066, 1080 (1999) ("[T]he evident purpose of the injunctive relief provision of the CLRA is not to resolve a private dispute but to remedy a public

---

This Court believes this standard would set the bar far too high in cases that address the enforceability of choice-of-law provisions.  Indeed, there is no indication that either Brazil or Medimatch actually applied this remarkably high bar to the choice-of-law provisions that they were considering.  The California Supreme Court has stated that the proper standard is whether a "fundamental policy" is contravened.  Nedlloyd, 3 Cal. 4th at 466. There may be circumstances, like those presented in the current case, where the law of another state is contrary to a fundamental policy of California, but where that law is not offensive to recognized standards of morality.  California law reflects a measured policy decision to enlist injured citizens as private attorneys general -- this may be a fundamental policy, even though alternative policy decisions need not be classified as "offensive."

**United States District Court**
For the Northern District of California

wrong. . . .   In other words, the plaintiff in a CLRA damages action is playing the role of a bona fide private attorney general.").   The California Supreme Court has held that, in certain contexts, the imposition of punitive damages may be "important to the effectuation" of statutory policies, see Armendariz v. Found. Health Psychcare Servs., Inc., 24 Cal. 4th 83, 103 (2000).[5]  Given the CLRA's anti-waiver provision and role as a deterrent and check on public harm, this Court concludes that punitive damages are in fact a "fundamental" part of the statutory scheme.   The injunctive relief authorized by the UCL and FAL raise similar policy concerns. See id.   In contrast, the MCPA does not share the same spirit of direct public action; it would allow Plaintiffs to sue to recover their own damages, and it would require them to act indirectly through state actors in order to receive equitable relief or deterrence-based remedies.   See Citaramanis, 328 Md. at 150. Because the MCPA would limit Plaintiffs to compensatory damages, this Court finds that the choice-of-law provision in the Subscriber Agreement conflicts with a fundamental policy set down in California law.

In AOL, a California court of appeal refused to enforce both a forum selection clause and a choice-of-law provision that entailed the use of Virginia law, where plaintiffs alleged a CLRA violation. 90 Cal. App. 4th 1.   The court cited both the limited remedies available under Virginia law (such as the lack of punitive damages

---

[5] At least one other court in this district has recently found that a statutory punitive damage provision in an employment discrimination statute could not be circumvented by a choice-of-law provision that calls for the application of Canadian law.  Martin v. D-Wave Sys., No. 09-3602, 2009 U.S. Dist. LEXIS 111561, *13-14 (N.D. Cal. Dec. 1, 2009).

**United States District Court**
For the Northern District of California

1   or injunctive relief), as well as limitations on the class action

2   procedures that would be imposed upon the plaintiffs.  Id. at 15-

3   18.  While there is no indication that Maryland law would limit

4   Plaintiffs' ability to pursue this suit as a class action,

5   Plaintiffs would be unable to pursue punitive damages authorized by

6   the CLRA, and this Court is not satisfied that Plaintiffs would

7   have access to the equitable remedies they seek.  The imposition of

8   Maryland law would therefore probably not compromise Plaintiffs'

9   statutory rights to the same extent that the application of

10   Virginia law would have in AOL, but it would nevertheless implicate

11   fundamental policies of California.

12       Having established that California and Maryland law is

13   different in an important regard, this Court must next inquire

14   whether California has a "materially greater interest" than

15   Maryland in imposing its laws to resolve the current dispute.

16   Nedlloyd, 3 Cal. 4th at 466.  Hughes contends that Maryland has a

17   greater interest in "protecting Hughes' interest in having its

18   transactions uniformly governed by Maryland law."  Mot. at 20.

19   This Court disagrees.  California has a stronger interest in

20   protecting its consumers through its chosen mechanisms -- a

21   statutory scheme that permits its injured consumers not only to

22   bring class actions to recover their losses, but also to seek

23   punitive damages and injunctive relief in order to deter and

24   prevent future harm to other consumers located in the state.  The

25   fact that Maryland law, by and large, forbids the same conduct as

26   California's consumer protection laws actually undermines Hughes'

27   argument, because Maryland companies would presumably not be

28   required to alter their behavior to conform to both sets of laws.

1    Maryland companies need only be mindful of the fact that, when

2    acting in California, they may be subject to the sharper teeth

3    embodied by California's consumer protection regime.  This Court

4    therefore concludes that this particular suit must be governed by

5    California law, at least with respect to Plaintiffs' UCL, FAL, and

6    CLRA claims.[6]

7        **B.   <u>Whether Plaintiffs Have Stated a Claim Under the UCL,
         FAL, and CLRA</u>**

8

9        As previously noted, Plaintiffs allege that Hughes violated

10   the CLRA by: (1) representing that its services have

11   characteristics which they do not have; (2) representing that its

12   services were of a particular standard or quality when they were of

13   another; (3) advertising its services with the intent to not sell

14   them as advertised; (4) advertising its services with the intent

15   not to supply reasonably expectable demand; (5) representing that a

16   transaction involves remedies that it does not, or which are

17   prohibited by law; (6)representing that a transaction has been

18   supplied in accordance with previous representations when it has

19   not been; and (7) inserting unconscionable provisions in the

20   Subscriber Agreement.  <u>See</u> Am. Compl. ¶¶ 77-79.  Plaintiffs' UCL

21   claims are based upon Hughes' alleged misrepresentations about its

22   services, as well as its use of the FAP and early cancellation

23

24   [6] The vast majority of Hughes' arguments regarding choice-of-law
     issues focuses exclusively on Plaintiffs' statutory causes of

25   action under the UCL, FAL, and CLRA.  It has cited to Maryland case
     law only with respect to two points in relation to other causes of

26   action, and on these issues the Court can find no material
     difference from the relevant California law.  Because Hughes and

27   Plaintiffs both rely primarily upon California and Ninth Circuit
     law, this Court does not address the question of whether Maryland

28   law should control Plaintiffs' nonstatutory causes of action, and
     proceeds to analyze these causes of action under California law.

1    fees.   Am. Compl. ¶ 91.

2         Hughes claims that all of Plaintiffs' causes of action fail to

3    "state a claim for relief that is plausible on its face," Mot. at

4    7-11, and that those causes of action that sound in fraud do not

5    state claims with sufficient particularity, as required by Rule

6    9(b) of the Federal Rules of Civil Procedure, id. at 11-14.   One

7    need not plead fraud in order to state a claim under the CLRA, UCL,

8    or FAL.   See Nordberg v. Trilegiant Corp., 445 F. Supp. 2d 1082,

9    1097 (N.D. Cal. 2006).   However, as the Ninth Circuit has observed:

10             While fraud is not a necessary element of a claim
              under the CLRA and UCL, a plaintiff may
11            nonetheless allege that the defendant engaged in
              fraudulent conduct.  A plaintiff may allege a
12            unified course of fraudulent conduct and rely
              entirely on that course of conduct as the basis
13            of that claim.  In that event, the claim is said
              to be 'grounded in fraud' or to 'sound in fraud,'
14            and the pleading . . . as a whole must satisfy
              the particularity requirement of Rule 9(b).

15

16   Kearns v. Ford Motor Co., 567 F.3d 1120, 1125 (9th Cir. 2009)

17   (quoting Vess, 317 F.3d at 1103-04).

18             1.    Allegations Related to Hughes' Representations of
                     the Speed and Quality of its Services

19

20        The Court first addresses Plaintiffs' allegations related to

21   Hughes' representations and advertisements regarding the speed and

22   quality of its services, which comprise their claims under the UCL,

23   FAL, and CLRA.[7]   As Plaintiffs are alleging that Hughes has made

24   these misrepresentations intentionally to deceive its consumers,

25   _____

26   [7] Plaintiffs allege causes of action for intentional and negligent
     misrepresentation or omission based on the same facts as their FAL,
     UCL and CLRA claims regarding the representation of services
27   provided.  Am. Compl. ¶¶ 99-119.  Hughes has blended its analysis
     of the first four causes of action in much of its own briefing.
28   The Court therefore does not separately address or analyze
     Plaintiffs' misrepresentation-based causes of action.

21

United States District Court
For the Northern District of California

these allegations sound in fraud.  The Court nevertheless finds that Plaintiffs have pled enough facts to state claims for relief that are both particular and plausible on their face.

The Amended Complaint does more than merely claim that Hughes was advertising that its services were "fast" while the services it provided were "slow."  It specifically alleges that Schumacher was unable to experience the speeds that Hughes had advertised its service as reaching "up to," even during non-peak hours.  Am. Compl. ¶ 65.  The Amended Complaint provides printouts of Hughes' publications that state "typical" speeds during peak times, id. Ex. B, but Schumacher claims that his average speeds during presumably faster non-peak times actually fell within the stated "peak" range, and that speeds during peak times were even slower than the advertised "typical" peak speeds.  Am. Compl. ¶ 65.  Bayless claims to have experienced average speeds that were slower than any of the "typical" speeds published by Hughes, and that speeds for more expensive plans were in fact slower than speeds for cheaper plans. See id. ¶¶ 57, 58.  Both Bayless and Walter claim to have frequently experienced slowdowns due to Hughes' FAP, and Walter claims that she experienced these slowdowns even before she had reached the applicable download thresholds.  Id. ¶¶ 57, 70. Although the Amended Complaint does contain a large number of vague and conclusory statements related to the speed and performance of Hughes' networks, the allegations related to the individual Plaintiffs' experiences are detailed, mutually supportive and, when taken together, plausible enough to survive a motion to dismiss.

Hughes claims that it did not promise or represent that users would achieve particular speeds or average speeds.  Mot. at 8-9.

United States District Court
For the Northern District of California

It similarly claims that no reasonable consumer would be misled by their representations, and that many of the representations that Plaintiffs identify are mere "puffery." Id. at 14-17. It is true that Courts may sometimes dismiss claims of deceptive practices where potentially deceptive language is tempered by the juxtaposition of clear and unambiguous language that makes it unlikely that a reasonable person may be deceived by the representations. See Freeman v. Time, Inc., 68 F.3d 285, 289-90 (9th Cir. 2007) (agreeing that "[i]t is clear from the exemplar that no reasonable addressee could believe that the mailing announced that the addressee was already the winner. . ."). However, the general rule is that whether the disparity between actual services and representations about those services is "deceptive" under the FAL, UCL, and CLRA is "a question of fact which requires 'consideration and weighing of evidence from both sides' and which usually cannot be made on demurrer." See Linear Technology Corp. v. Applied Materials, Inc., 152 Cal. App. 4th 115, 134-35 (Ct. App. 2007) (quoting McKell v. Wash. Mutual, Inc., 142 Cal. App. 4th 1457, 1472-73 (Ct. App. 2006)).

This Court believes that Plaintiffs' allegations are sufficient to call into question Hughes' representations as to the speed of its services, even when they are considered in light of its representations about its "typical" speeds. Hughes' representations disclose hard, measurable quantities that cannot be characterized as mere "puffery." Plaintiffs claim that they were often unable to reach even the "typical" speeds, and that the off-peak speeds ended up being as slow as the advertised "typical" speeds. A reasonable jury could find that representations about

23

its internet services are deceptive even in light of Hughes'

disclosures that it could not guarantee any particular or average

speed.  Whether the experience of these Plaintiffs was unique, or

whether it was ultimately the result of lawful and non-deceptive

causes (such as a judicious application of the FAP) is a question

to be answered later.

Hughes also argues that actual reliance is an element of

fraud-based claims under the FAL, UCL and CLRA, and claims that

Plaintiffs have failed to plead the "who, what, when, where and

how" of the alleged misconduct.  Mot. at 12-13 (quoting <u>Kearns</u>, 567

F.3d at 1124, 1125-26).  Although Plaintiffs cite a number of

recent representations and advertisements, Hughes points out that

"all of the allegedly misleading statements identified by

plaintiffs were made years after plaintiffs signed up for the

Hughes service, making it impossible for plaintiffs to have relied

upon them."  <u>Id.</u> at 13.  The question is whether Plaintiffs can

meet their burden for pleading reliance without identifying the

particular advertisements or representations upon which they relied

when they entered or upgraded their service with Hughes.

The Court is satisfied that the pleadings in the Amended

Complaint are sufficiently particular to plead reliance.  Although

Plaintiffs have not cited specific advertisements that predate

their use of Hughes' services, each Plaintiff alleges that they

subscribed to Hughes' services based on Hughes' representations,

which (although roughly described) are comparable to the more

recent representations, which are alleged with greater

particularity.  Am. Comp. ¶¶ 56, 61, 69.  Plaintiffs are, in

essence, asking this Court to make an inference that Hughes'

**United States District Court**
For the Northern District of California

1   representations have been consistent over time in certain material

2   respects, dating back for the last several years.  Id.  The Court

3   finds this to be a reasonable inference.  Because Plaintiffs have

4   identified recent, particular representations from Hughes'

5   marketing campaign, and alleged that they relied on similar or

6   identical representations made at earlier times, Plaintiffs have

7   adequately notified Hughes of the claims against it.  Bly-Magee v.

8   California, 236 F.3d 1014, 1019 (9th Cir. 2001) (citation and

9   internal quotation marks omitted) ("To comply with Rule 9(b),

10  allegations of fraud must be specific enough to give defendants

11  notice of the particular misconduct which is alleged to constitute

12  the fraud charged so that they can defend against the charge and

13  not just deny that they have done anything wrong."); c.f. In re

14  Tobacco II Cases, 46 Cal. 4th 298, 328 (2009) ("[W]here, as here, a

15  plaintiff alleges exposure to a long-term advertising campaign, the

16  plaintiff is not required to plead with an unrealistic degree of

17  specificity that the plaintiff relied on particular advertisements

18  or statements.").

19      While Plaintiffs' pleadings are less particular regarding

20  Hughes' allegedly illegitimate use of the FAP, as well as its

21  theory that Hughes intentionally "oversold" its services by

22  providing services to more clients than it had the bandwidth to

23  support, the Court sees no harm in permitting Plaintiffs to proceed

24  with either of these arguments.  Both are potential explanations

25  for Plaintiffs' experiences with slow internet connections, and are

26  pled as elements that contribute to these slow speeds, rather than

27  as independent causes of action.  See Am. Compl. ¶ 43.  Both topics

28  will therefore be ripe for discovery, whether this Court construes

United States District Court
For the Northern District of California

them as independent theories of recovery or not.  When taken together with Plaintiffs' allegations regarding their slow transfer rates, the Court finds that these allegations present plausible claims.[8]

### 2.   Allegations Related to Hughes' Termination Fees

Plaintiffs allege that Hughes' termination fees are unlawful penalties under Civil Code sections 1671(c) and (d) ("§ 1671"), and therefore "unlawful" under the UCL.  Am. Compl. ¶ 93.  Plaintiffs claim that these fees are imposed "without any individualized analysis of the actual damages incurred."  Id. ¶ 53.  Plaintiffs liken the termination fees provision to a liquidated damages provision.  See id. ¶ 93.  Under section 1671 of the California Civil Code:

> [In a] contract for the retail purchase, or rental, by such party of personal property or services, primarily for the party's personal, family, or household purposes, . . . [¶] . . . a provision in a contract liquidating damages for the breach of the contract is void except that the parties to such a contract may agree therein upon an amount which shall be presumed to be the amount of damage sustained by a breach thereof, when, from the nature of the case, it would be impracticable or extremely difficult to fix the actual damage.

Cal. Civ. Code § 1671(c)-(d).

Hughes argues that Plaintiffs have failed to sufficiently plead a claim that is plausible on its face, because "no pled facts support [the] bald conclusion" that the provision violates

---

[8] Plaintiffs' Amended Complaint includes brief allegations that Hughes "selectively block[s] certain types of connections," including P2P connections.  Am. Compl. ¶ 3.  The Court notes that Plaintiffs do not clearly or explicitly integrate this into a particular cause of action, or explain how it presents a basis for recovery.  The Court therefore does not construe this as an independent theory of recovery.

United States District Court
For the Northern District of California

1  California law.  Mot. at 10-11.  It faults Plaintiffs for not

2  pleading facts that indicate how the early termination fees are

3  actually applied in practice.  Id. at 11.

4      This Court agrees that Plaintiffs have failed to allege a

5  plausible claim for violation of § 1671.  California courts have

6  defined "liquidated damages" as "an amount of compensation to be

7  paid in the event of a breach of contract, the sum of which is

8  fixed and certain by agreement . . . ."  See Chodos v. W. Publ.

9  Co., 292 F.3d 992, 1002 (9th Cir. 2002) (quoting Kelly v. McDonald,

10 98 Cal. App. 121, 125 (Ct. App. 1929)).  The allegations in the

11 Amended Complaint undermine the contention that the termination fee

12 set out in section 2.3 of the Subscriber Agreement is in fact a

13 claim for liquidated damages.  This provision states that customers

14 who terminate their subscription before the specified date "may be

15 subject [to] a termination fee of up to $700," but that the "exact

16 amount . . . is a function of when your account is terminated and

17 the type of Service Plan you are on."  Subscriber Agreement ¶ 2.3.

18 Although Plaintiffs allege that a "$400 fee is imposed without any

19 individualized analysis of the actual damages incurred," the

20 Amended Complaint only mentions a single specific application of

21 this provision, when Bayless was subject to a $300 fee.  Am. Compl.

22 ¶¶ 53, 59.  This belies Plaintiffs' conclusory claim that the

23 termination fee was a fixed sum.  Plaintiffs have therefore failed

24 to allege that the Subscriber Agreement included a fixed fee that

25 constituted impermissible liquidated damages under § 1671.  C.f.

26 Ruwe v. Cellco P'ship, 613 F. Supp. 2d 1191, 1196, 1198 (discussing

27 requirement that liquidated damage provision include "fixed fee" to

28 maintain § 1671 claim).

United States District Court
For the Northern District of California

Plaintiffs also allege that the fee is "unconscionable," and therefore in violation of the CLRA, which forbids "[i]nserting an unconscionable provision in the contract."  Cal. Civ. Code § 1770(19).  The term "unconscionable" "has both a procedural and a substantive element.  The former takes into consideration the parties' relative bargaining strength and the extent to which a provision is 'hidden' or unexpected, while the substantive element requires terms that 'shock the conscience' or at the least may be described as 'harsh or oppressive.'"  Trend Homes, Inc. v. Super. Ct., 131 Cal. App. 4th 950, 956 (Ct. App. 2005) (quoting Woodside Homes of California, Inc. v. Sup. Ct., 107 Cal. App. 4th 723, 727 (Ct. App. 2003).  Plaintiffs simply state that the imposition of the fee was unconscionable, without explaining how it "shocked the conscience" or was "harsh or oppressive" at the time the agreements were entered into.  Plaintiffs indicate that the $300 cancellation fee paid by Bayless was less than two-months worth of service charges at the time he made it.  See Am. Compl. ¶¶ 58-59. Plaintiffs have not alleged that Hughes incurred no costs in providing their services, and "the fee may be viewed not only as a charge to recompense the [provider] for its costs incurred in [providing the services], but as a deferred fee for all of the services provided . . . in opening, maintaining, and terminating" the relationships between the parties.  See Morris v. Redwood Empire Bancorp, 128 Cal. App. 4th 1305, 1323-24 (Ct. App. 2005) (dismissing unconscionability claim for bank termination fees). The "shock the conscience" standard is a high one, and Plaintiffs have simply not pled enough facts to support a claim for unconscionability.

28

**United States District Court**
For the Northern District of California

Finally, Plaintiffs contend that the termination fee provision is void because Hughes' duties under the contract are entirely illusory. Am. Compl. ¶¶ 52, 129. Plaintiffs allege that "the Subscriber Agreement does not commit HughesNet to *anything* with respect to internet service," because Hughes disclaims any representation that services will be "uninterrupted or operate at any minimum speed." Id. ¶ 52 (emphasis in original) (quoting Subscriber Agreement ¶ 11.1). "An illusory promise is one containing words in promissory form that promise nothing and which do not purport to put any limitation on the freedom of the alleged promisor." Flores v. Am. Seafoods Co., 335 F.3d 904, 912 (9th Cir. 2003). "Under California law, an obligation under a contract is not illusory if the obligated party's discretion must be exercised with reasonableness or good faith." Milenbach v. Comm'r, 318 F.3d 924, 930 (9th Cir. 2003). The Court rejects Plaintiffs' extreme reading of the Subscriber Agreement -- no reasonable person would conclude that the contract did not bind Hughes to provide at least some minimal level of internet-related services. The mere fact that the contract permitted Hughes an unspecified level of interruption or poor transfer rates does not render Hughes' obligations illusory.

The Court therefore DISMISSES the first cause of action for violation of the CLRA only with respect to Plaintiffs' allegations regarding the termination fees. The Court also DISMISSES the second cause of action for violation of the FAL and UCL, only with respect to Plaintiffs' allegations regarding Hughes' termination fees. Although the Court finds that Plaintiffs have not adequately pled that the termination fee provision, in and of itself, gives

**United States District Court**
For the Northern District of California

rise to independent causes of action, the Court makes no judgment at this time as to whether the termination fees paid by Plaintiffs may be cognizable as damages under their other theories of recovery.

### C.   <u>Money Had and Received</u>

Plaintiffs' fifth cause of action is for money had and received. Am. Compl. ¶¶ 120-26.  "The foundation of an action for conversion on a money had and received count is the unjust enrichment of the wrongdoer, and in order for plaintiff to recover in such action she must show that a definite sum, to which she is justly entitled, has been received by defendant." <u>Bastanchury v. Times-Mirror Co.</u>, 68 Cal. App. 2d 217, 236 (Ct. App. 1945).  A plaintiff must plead that the defendant "is indebted to the plaintiff in a certain sum for money had and received by the defendant for the use of the plaintiff." <u>Schultz v. Harney</u>, 27 Cal. App. 4th 1611, 1623 (1994) (citation and internal quotation marks omitted).  "The cause of action is available where . . . the plaintiff has paid money to the defendant pursuant to a contract which is void for illegality." <u>Id.</u>

Plaintiffs base their claim for money had and received upon the allegation that "HughesNet has become indebted to Plaintiff [sic] and class members in the amount of early termination fees paid during that period and such other amounts which may have been acquired by means of any practice found by this Court to be illegal, unfair or deceptive . . . ." Am. Compl. ¶ 122.  This fails to state a "definite sum" to which Plaintiffs are justly entitled.  The Court has already determined that Plaintiffs have failed to state an independent cause of action based on the

**United States District Court**
For the Northern District of California

termination fee provision in the Subscriber Agreement.  Plaintiffs have not otherwise alleged that the relevant portions of the Subscriber Agreement were void.  They cite no authority for the proposition that money received as a result of deceptive advertising practices can be recoverable under a theory of money had and received.  Consequently, this cause of action is DISMISSED.

### D.   Declaratory Relief

As Plaintiffs' sixth cause of action, they request declaratory relief, and ask this Court to determine the rights and obligations of the parties under the Subscriber Agreement.  Am. Compl. ¶¶ 127-31.  This Court has already addressed most of the bases upon which Plaintiffs request declaratory relief: It has concluded that Hughes' obligations under the contract were not illusory, and it has declined to address the arbitration and anti-class action provisions as there is currently no controversy between the parties with respect to these issues.  The Court has further found that Plaintiffs have not alleged a basis for voiding the termination-fee provision.

Plaintiffs allege that "HughesNet's failure to provide service reasonably consistent with its advertisements and promises excused any further performance by class members." Id. ¶ 129b.  The Amended Complaint does not attempt to allege that Hughes had undertaken a duty to provide internet services at any particular speed (in fact, it alleges quite the opposite, see id. ¶ 52), or that Hughes' slow service speeds were so unreasonable as to constitute a breach of the Subscriber Agreement.  If Plaintiffs seek a finding that they are excused from performance due to Hughes' nonperformance, they must clearly allege facts that are

suggestive of Hughes' breach of contract.  Based on this Court's reading of the Subscriber Agreement, Plaintiffs do not allege that slow connection speeds alone amounted to nonperformance on Hughes' part.[9]  Plaintiffs' sixth cause of action is therefore DISMISSED.

**V.    CONCLUSION**

The Court hereby GRANTS IN PART and DENIES IN PART Hughes' Motion to Dismiss.  The Court DENIES Hughes' Motion to Dismiss Plaintiffs' first and second causes of action, except that the Court hereby STRIKES Plaintiffs' allegations regarding the illegality of Hughes' termination fees.  Plaintiffs have leave to amend their allegations regarding Hughes' termination fees.  The Court DENIES Hughes' Motion to Dismiss Plaintiffs' third and fourth causes of action.  Plaintiffs' fifth and sixth causes of action are DISMISSED WITHOUT PREJUDICE.

Should Plaintiffs choose to submit a second amended complaint, it must be submitted no later than thirty (30) days after the date of this Order.

IT IS SO ORDERED.

Dated: January 26, 2010

UNITED STATES DISTRICT JUDGE

_____

[9] This is, of course, a question that is wholly separate from the question of whether the slow performance of Hughes' services rendered their contrary representations and advertisements deceptive or fraudulent.

United States District Court
For the Northern District of California