1

2

3

4          IN THE UNITED STATES DISTRICT COURT

5         FOR THE NORTHERN DISTRICT OF CALIFORNIA

6

7   TINA WALTER, CHRISTOPHER BAYLESS,   ) Case No. 09-2136 SC
    and ERIC SCHUMACHER, individually   )
8   and on behalf of all others         ) ORDER DENYING PLAINTIFFS'
    similarly situated,                 ) MOTION FOR CLASS
9                                        ) CERTIFICATION AND
10            Plaintiffs,                ) PRELIMINARY APPROVAL OF
                                         ) SETTLEMENT
11       v.                              )
                                         )
12  HUGHES COMMUNICATIONS, INC., and     )
13  HUGHES NETWORK SYSTEMS, LLC,         )
                                         )
14            Defendants.                )
                                         )
15  ─────────────────────────────────────

16  I.   **INTRODUCTION**

17        On February 3, 2011, the Court denied the Motion for

18  Preliminary Approval of Settlement and Conditional Class

19  Certification that was filed by Plaintiffs Tina Walter ("Walter"),

20  Christopher Bayless ("Bayless"), and Eric Schumacher ("Schumacher")

21  (collectively, "Named Plaintiffs" or "Plaintiffs") and joined by

22  Defendants Hughes Communications, Inc. and Hughes Network Systems,

23  LLC (collectively, "Hughes").  ECF Nos. 60 ("Motion"), 69 ("Feb. 3,

24  2011 Order").  Plaintiffs have since renoticed their motion and

25  Plaintiffs and Hughes have filed additional briefs in support of

26  it.  ECF Nos. 72 ("Pls.' Supp. Br."), 73 ("Defs.' Joinder").  The

27  Court has reviewed the documents submitted, and for the following

28  reasons, it DENIES the Motion.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

## II. <u>BACKGROUND</u>

### A. <u>Factual Background</u>

Hughes is a satellite broadband Internet technology and service provider ("ISP") that sells Internet access via satellite to consumers in rural areas where Internet service is not available through digital subscriber lines ("DSL") or cable. ECF No. 44 ("SAC") ¶ 2. Hughes advertises a variety of service plans which offer different download and upload speeds at different prices:

> For example, HughesNet offers the following "Home" plans: The Home Plan, for a monthly fee of $59.99, is advertised with download speeds at 1.0 Mbps; the Pro Plan, for a monthly fee of $69.99, is advertised with download speeds at 1.2 Mbps; the ProPlus Plan, for a monthly fee of $79.99, is advertised with download speeds at 1.6 Mbps; the Elite Plan, for a monthly fee of $119.99, is advertised with download speeds at 2.0 Mbps; the ElitePlus Plan, for a monthly fee of $189.99, is advertised with download speeds at 3.0 Mbps; and the ElitePlus Plan, for a monthly fee of $349.99, is advertised with download speeds at 5.0 Mbps.

<u>Id.</u> ¶ 27. Regardless of the plan selected, Hughes requires a two-year commitment from its subscribers; those who cancel their service are obligated to pay an early termination fee ("ETF"). <u>Id.</u> ¶ 52. Until September 1, 2008, Hughes charged a $300 ETF; subscriptions activated after September 1, 2008 were subject to a $400 ETF. <u>Id.</u> ¶ 28.

Hughes also maintains what it calls a "Fair Access Policy" ("FAP"). Under the FAP, Hughes caps the amount of data its subscribers may download in a day. <u>Id.</u> ¶ 46. Hughes advertises that "[a] small percentage of subscribers who exceed this limit will experience a temporary reduction of speed." <u>Id.</u> This reduction in download speed continues for approximately twenty-four

2

**United States District Court**
For the Northern District of California

1  hours, and serves to discourage subscribers from bandwidth-

2  intensive Internet activity.  Id. ¶ 47.

3      In this action, Plantiffs claim to be current and former

4  subscribers and allege that Hughes falsely advertised Internet

5  service speeds; oversold and/or capped the speed of its Internet

6  service; failed to properly disclose its policy of limiting the

7  amount of data users can upload or download; and imposed a $400

8  early cancellation fee that was "unconscionable and unenforceable

9  under California law."  See id. ¶¶ 2, 26-55.

10      Plaintiff Bayless claims that as a Hughes subscriber, he

11  frequently experienced slow Internet service and had difficulty

12  connecting to the Internet numerous times.  Id. ¶ 60.  Bayless

13  alleges that even after upgrading to Hughes's ElitePlus Internet

14  service, his Internet speed was "approximately half" of the

15  advertised speed.  Id. ¶ 61.  Bayless claims that when he cancelled

16  his subscription in November 2008, he paid a $300 early termination

17  fee.  Id. ¶ 62.

18      Plaintiff Schumacher claims that he upgraded his Hughes

19  Internet subscription to the Pro plan due to Hughes's advertising

20  of a maximum speed of "up to 1.2 Mbps" and "typical speeds about

21  700 Kbps to 800 Kbps during peak times."  Id. ¶ 66.  Schumacher

22  alleges that the average speed of his Internet service during both

23  peak and non-peak times was "651 Kbps, approximately half of the

24  advertised speed."  Id. ¶ 68.  Schumacher then upgraded to Hughes's

25  Small Office plan, which he claims also did not perform at

26  advertised speeds.  Id. ¶¶ 69-71.  Schumacher terminated his

27  subscription in or around January 2009.  Id. ¶ 71.

28      Walter subscribed to Hughes's Home plan.  Walter alleges that

**United States District Court**
For the Northern District of California

1  she experienced "significantly slow, and at times non-existent,

2  upload and download speeds," which she attributes to both "the

3  speed of the service" and "because the FAP was implemented more

4  stringently than the disclosures to her had represented." Id. ¶

5  73.

6      Plaintiffs initially sought to represent a class of "all

7  citizens of the State of California who are or were subscribers to

8  HughesNet's satellite broadband and Internet equipment services

9  during the four years preceding the filing of the complaint" and a

10  subclass of "all citizens of the State of California who are

11  consumers under Civil Code section 1761(d) and are or were

12  subscribers of HughesNet's satellite broadband and internet

13  equipment services during the three years preceding the filing of

14  the complaint." Id. ¶¶ 13-14.  In the Third Amended Complaint

15  filed with the Motion, Plaintiffs seek to expand this class to all

16  Hughes subscribers throughout the United States.  ECF No. 63

17  ("TAC").

18      **B.**   **Procedural Background**

19      Walter and Bayless filed their initial complaint on May 15,

20  2009.  ECF No. 1 ("Initial Compl.").  Schumacher filed a complaint

21  against Hughes with similar claims in California state court on

22  June 9, 2009; this action was subsequently removed to federal court

23  and consolidated with the earlier-filed action.  ECF No. 17.  The

24  parties stipulated to multiple extensions of Hughes's deadline to

25  respond to the complaint.  ECF Nos. 5, 13.  On September 3, 2009,

26  Plaintiffs amended their complaint.  See ECF No. 18 ("FAC").  On

27  October 5, 2009, Hughes moved to dismiss the FAC.  ECF No. 20.  On

28  January 26, 2010, the Court granted in part and denied in part

United States District Court
For the Northern District of California

Hughes's motion to dismiss, dismissing two claims with prejudice and two claims without prejudice, and granting Plaintiffs leave to amend their complaint.  ECF No. 40.  On February 26, 2010, Plaintiffs filed their Second Amended Complaint.  See SAC.  On March 18, 2010, Hughes filed a second motion to dismiss.  ECF No. 45.  Shortly thereafter, the parties began mediation and Hughes withdrew its motion to dismiss.  ECF No. 55.  On January 7, 2011, after several additional continuances, Plaintiffs filed an unopposed motion for preliminary approval of a class action settlement.  ECF No 60.

Plaintiffs concurrently filed their Third Amended Complaint. In it, Plaintiffs bring four causes of action: (1) violation of California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, et seq., as well as "similar applicable consumer protection law of other states", TAC ¶¶ 73-84; (2) violation of California's Unfair Competition Law ("UCL"), Cal. Civ. Code § 17200, as well as "similar applicable unfair competition law of other states"; TAC ¶¶ 85-98; (3) negligent misrepresentation, id. ¶¶ 99-109; and (4) intentional misrepresentation and omission, id. ¶¶ 110-119.  Whereas in the first three complaints, Plaintiffs sought to represent a class of Hughes's California customers, Plaintiffs now seek to represent "[a]ll residents of the United States of America who are or were subscribers to Hughes' satellite broadband and internet equipment services during the four years preceding the filing of the original complaint" and a subclass of "[a]ll residents of the United States of America who are consumers under Civil Code section 1761(d) and are or were subscribers of Hughes' satellite broadband and internet equipment services during

1  the three years preceding the original filing of the complaint."

2  Id. ¶¶ 13-14.

3       The Court denied the Motion, finding that the papers submitted

4  failed to provide basic information about the proposed class.  See

5  Feb. 3, 2011 Order.  The Court granted the parties leave to renew

6  their motion and advised the parties include to information such as

7  estimates of the size of the class, the total gross amount to be

8  recovered, and the cost of administration and notice.  Id.  The

9  Court also ordered briefing and evidence supporting "Plaintiffs'

10  threadbare assertion that the requirements of Federal Rules 23(a)

11  and (b)(3) are satisfied," and ordered additional briefing on the

12  proposed form of notice to the class.  Id.

13       The parties have since renewed their motion for preliminary

14  approval of the settlement.  The terms of the settlement have not

15  changed, but the parties have revised the notice documents in

16  response to the Court's February 3, 2011 Order.  See Rosenberg

17  Supp. Decl. Ex. 1 ("Settlement"), id. Ex. A ("Claim Form"); Ezrin

18  Decl. Exs. D ("Long Form"), E ("Postcard"), F ("Summary Notice").[1]

19  Plaintiffs also submit firm resumes of Plaintiffs' three counsel,

20  Bramson, Plutzik, Mahler & Birkhaeuser LLP ("Bramson Plutzik"),

21  Audet & Partners LLP ("Audet"), and Pogust, Braslow & Millrood, LLC

22  ("Pogust") as evidence that they are adequate class counsel.  Ezrin

23  Decl. Exs. A, B, C.

24  ///

25  _____

26  [1] Jennifer Rosenberg ("Rosenberg"), counsel for Plaintiffs filed a
declaration in support of the Motion, ECF No. 61, which she later
corrected in a supplemental declaration, ECF No. 66.  Joshua C.

27  Ezrin ("Ezrin"), counsel for Plaintiffs, filed a declaration in
support of the Settlement, which Plaintiffs attached to their

28  Supplemental Brief.

**C.    The Proposed Settlement**

      1.    Class Structure

Under the settlement, the class that would be certified and subject to the settlement's release of liability is defined as:

> All persons and entities residing in the United States of America who, during any time between May 15, 2005 and the Preliminary Approval Date, were subscribers to any of the Hughes' Consumer Service Plans.
>
> Excluded from this definition are Hughes Communications, Inc. and Hughes Network Systems, LLC, and their respective subsidiaries, affiliates, dealers, employees, directors, and the legal representatives, heirs, successors and assigns of the individuals and entities previously referenced in this sentence, and any government entities.

Settlement § 1.27.

      2.    Injunctive Relief

Under the proposed settlement, Hughes would alter its practice of charging a $400 flat ETF and instead pro-rate its ETF such that it would vary between $85 and $400 depending on the number of months left on the subscriber's 24-month contract.  Pls.' Supp. Br. at 6.  Hughes would be required to maintain this rate schedule for at least "18 months after the effectiveness of the new schedule," and not return to a flat ETF for a period of three years.  Id. Plaintiffs provide a chart which they claim shows that the "estimated minimum value of the changes to the ETF policy is approximately $4,472,662."  Id. at 7.

Hughes would alter its FAP to provide subscribers with what it calls "FAP Tokens."  Id.  These "tokens" would allow subscribers to reset their download allowances once per month if they reached their maximum download allowance under the FAP for that month.  Id.

United States District Court

For the Northern District of California

1  Plaintiffs estimate the value of this portion of the injunctive

2  relief at $10,099,388.  Id. at 8.

3  Hughes would also alter its advertising such that "[w]hen

4  advertising upload or download speeds measured in MBPS or KBPS for

5  its consumer plans, Hughes will include a disclosure in reasonable

6  proximity to the advertised speeds that states that advertised

7  upload and download speeds are not guaranteed and may be slower

8  than the maximum advertised speeds, particularly during peak

9  times." Id. at 7.  The parties do not attempt to estimate the

10  value of this relief to the class.

11  Plaintiffs estimate that the injunctive relief contemplated

12  under the settlement will confer a total benefit of roughly $14

13  million on the class.

14  3.  Economic Relief

15  Under the proposed settlement, former subscribers who paid an

16  ETF prior to December 6, 2010 would receive a $40 cash payment, and

17  former subscribers who did not pay an ETF would receive a $5 cash

18  payment.  Settlement § 2.6.  Current subscribers as of the date of

19  preliminary approval would receive no cash compensation.

20  Receipt of the cash payment would be conditioned on each class

21  member's submission of a valid and timely claim form in which he or

22  she affirm the above facts, as well as the fact that he or she

23  returned "all equipment leased from or provided by Hughes" within

24  ninety days of cancelling his or her Hughes service.  Id.; see

25  Claim Form.  Plaintiffs estimate that approximately 73,837 of the

26  class members paid an ETF during the class period and would

27  therefore be potentially eligible for the $40 cash payment.  Pls.'

28  Supp. Br. at 9.  Plaintiffs estimate that  approximately 465,706

United States District Court
For the Northern District of California

1   former subscribers did not pay an ETF and would therefore be

2   eligible for the $5 cash payment.  Id.  Plaintiffs multiply the

3   size of the cash payments by the number of class members eligible

4   to receive them to calculate "the total amount of cash compensation

5   available to the Class under the Settlement" at approximately

6   $5,282,010.  Id.

7           4.   Fee Awards

8       Hughes agrees to pay Plaintiffs' counsel up to $980,000 in

9   attorney fees and expenses once the settlement becomes final,

10  subject to Court approval.  Settlement § 2.9.  This fee amount is

11  in addition to the relief Hughes will provide to the settlement

12  class -- it would not be paid out of a common fund.  Id.  The

13  parties also intend to seek a cash payment of $5,000 to compensate

14  each of the three Named Plaintiffs.  Id. § 2.11.

15          5.   Notice

16      The parties propose providing notice of the settlement to the

17  class via a Postcard sent via direct mail, a Long Form sent via e-

18  mail, and a Summary Notice published in USA Today.  Id. § 3.2.  The

19  parties agree that a "professional claims administrator" will

20  administer the claims resolution process, issuing class notice and

21  claim forms, determining and issuing settlement payments, and

22  responding to class member inquiries.  Id. §§ 2.7, 3.2.  Hughes

23  would pay all costs of notice.  Id. § 2.9.

24      The Postcard would be sent via First Class U.S. Mail to each

25  class member for whom Hughes has a valid mailing address.  Pls.'

26  Supp. Br. at 10.  Plaintiffs allege that "because installation of

27  Hughes equipment requires a physical address, Hughes customer

28  account records necessarily include a mailing address for 100% of

**United States District Court**
For the Northern District of California

1   the approximately 1.1 million class members," id. at 10, and that

2   Hughes has already determined that two percent of these addresses

3   are no longer valid "e.g., based on a returned mailing."  Mathur

4   Decl. ¶ 3.[2]  Hughes admits that in addition to this two percent, "a

5   certain percentage" of class members "will have moved their

6   residences since providing an address to Hughes."  Id.  Hughes does

7   not attempt to estimate this "certain percentage," but they propose

8   updating their address list using the National Change of Address

9   System ("NCOA").  Pls.' Supp. Br. at 10.  The parties do not

10  attempt to determine a "reach calculation" -- that is, an estimate

11  of the number of class members to receive notice -- for notice via

12  the Postcard.

13      The Postcard states: "you may be entitled to cash or non-cash

14  benefits."  See Postcard.  It provides no information on the size

15  of the cash awards available under the settlement.  It also states

16  that "any legal claim you may have against Hughes related to this

17  lawsuit will be settled" if the class member does not exclude him

18  or herself and if the Court approves the settlement.  Id.  It

19  directs the recipient to a yet-unidentified Web site to read the

20  Long Form and access the Claim Form.   Id.

21      The Long Form would be sent via e-mail and would also be

22  available on the settlement Web site.  Hughes claims to have e-mail

23  addresses for approximately 79 percent of the class members, but

24  concedes that only approximately 40 percent of these addresses are

25  still valid.  Marthur Decl. ¶ 4.  As such, by Hughes's estimates,

26  Hughes only has valid and current e-mail addresses for 31 percent

27  _____

28  [2] Alok Mathur ("Mathur"), director of business processes for
    Hughes, filed a declaration in support of the settlement, which
    Plaintiffs attached to their Supplemental Brief.

**United States District Court**
For the Northern District of California

1    of the class.

2        The Summary Notice would be published as a one-eighth-page

3    advertisement in USA Today on two consecutive days.  Pls.' Supp.

4    Br. at 11.  It is a simple text-only advertisement, and it provides

5    basic information about the proposed settlement.

6        The parties estimate that the cost of the above-mentioned

7    forms of notice will be $365,300; the parties estimate the

8    administration costs for administering the settlement to "range

9    from approximately $69,000 to $84,000," depending on how many

10   claims are submitted.  Id.

11            6.   Releases of Liability

12       Under the settlement, all of the class members who do not

13   affirmatively opt out of the class by providing the claims

14   administrator with timely notice of intention to opt out would be

15   subject to the following release of liability:

16              [The class members] [s]hall release and forever
                discharge, and shall be forever barred from
17              instituting, maintaining or prosecuting against
                any or all of the Released Persons, any and all
18              claims, liens, demands, actions, causes of
                action, obligations, damages or liabilities of
19              any nature whatsoever, whether legal, equitable
                or otherwise, arising from or relating to the
20              subject matter of this Litigation, including,
                without limitation, the charging of ETFs, the
21              HughesNet Fair Access Policy, the actual or
                advertised download, upload or other internet
22              speeds, any advertising or other public
                statement relating to the foregoing and/or any
23              other matter alleged in the Complaint
                (collectively, the "Claims"), insofar as such
24              Claims were asserted or could have been
                asserted in this Litigation or in any other
25              lawsuit or arbitration proceeding in any venue
                or forum on or before the date of the Final
26              Order Date, or based on Hughes implementation
                of this Settlement Agreement in accordance with
27              its terms.

28

**United States District Court**
For the Northern District of California

1  Settlement § 4.1.   The class would also waive any claims not known

2  at the time of the release under California Civil Code § 1542.   Id.

3

4  **III.  LEGAL STANDARD**

5       No class action may be settled without court approval.   Fed.

6  R. Civ. P. 23(e).   When the parties to a putative class action

7  reach a settlement agreement prior to class certification, "courts

8  must peruse the proposed compromise to ratify both the propriety of

9  the certification and the fairness of the settlement."   Staton v.

10  Boeing Co., 327 F.3d 938, 952 (9th Cir. 2003).   First, the Court

11  must assess whether a class exists.   Id. (citing Amchem Prods. Inc.

12  v. Windsor, 521 U.S. 591, 620 (1997)).   Second, the court must

13  determine whether the proposed settlement "is fundamentally fair,

14  adequate, and reasonable."   Hanlon v. Chrysler Corp., 150 F.3d

15  1011, 1026 (9th Cir. 1998).

16

17  **IV.  DISCUSSION**

18       **A.   Class Certification**

19       Federal Rule of Civil Procedure 23(a) provides four

20  requirements for class certification: (1) numerosity ("the class is

21  so numerous that joinder of all members is impracticable"); (2)

22  commonality ("there are questions of law or fact common to the

23  class"); (3) typicality ("the claims or defenses of the

24  representative parties are typical of the claims or defenses of the

25  class"); and (4) adequacy of representation ("the representative

26  parties will fairly and adequately protect the interests of the

27  class").   Fed. R. Civ. P. 23(a)(1)-(4).   In addition, the court

28  must also find that the requirements of Rule 23(b)(1), (b)(2), or

United States District Court
For the Northern District of California

(b)(3) are satisfied.  Wal-Mart Stores, Inc. v. Dukes, __ U.S. __, 2011 WL 2437013, at *5 (2011).  Rule 23(b)(3) requires a finding by the court "that questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Courts refer to the requirements of Rule 23(b)(3) as its "predominance" and "superiority" requirements.  Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 615 (1997).

More than a pleading standard, Rule 23 requires the party seeking class certification to "affirmatively demonstrate . . . compliance with the rule -- that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc."  Wal-Mart, 2011 WL 2437013, at *10 (emphasis in original).  This requires a "rigorous analysis" which frequently "will entail some overlap with the merits of the plaintiff's underlying claim."  Id.

Plaintiffs no longer seek certification of a class and a subclass -- they seek certification of a single class of "[a]ll persons and entities residing in the United States of America who, during any time between May 15, 2005 and the Preliminary Approval Date, were subscribers to any of the Hughes' Consumer Service Plans."  Settlement § 1.27.

1.   Numerosity

Rule 23(a)(1) provides that a class action may be maintained only if "the class is so numerous that joinder of all parties is impracticable."  Fed. R. Civ. P. 23(a)(1).  However, "impracticable" does not mean impossible; it refers only to the

**United States District Court**
For the Northern District of California

difficulty or inconvenience of joining all members of the class.
<u>Harris v. Palm Springs Alpine Estates, Inc.</u>, 329 F.2d 909, 913-14
(9th Cir. 1964).

Plaintiffs allege that the class consists of approximately 1.1
million individuals. Pls.' Supp. Br. at 12. In support of this
estimate, they attach the declaration of Michael J. Bass ("Bass"),
a senior systems analyst for Hughes.[3]  Bass declares that he
reviewed Hughes's subscription data and alleges that it shows that
there were 200,875 Hughes subscribers in May 2005, and that 885,719
new subscribers have joined in the intervening period. <u>Id.</u> ¶ 3.
Bass declares that because approximately 539,543 of this total
class are no longer Hughes customers, Hughes has roughly 549,051
current subscribers. <u>Id.</u> Bass also states that as of December 31,
2010, a total of 73,837 former subscribers were charged ETFs, and
he estimates that the "vast majority" of these subscribers were
charged prior to December 6, 2010. <u>Id.</u> ¶ 6.

In light of the above, the Court finds the numerosity
requirement to be satisfied.

2.   <u>Commonality</u>

Rule 23(a)(2) requires that there be "questions of law or fact
common to the class." Fed. R. Civ. P. 23(a)(2). <u>Wal-Mart</u>, decided
after the parties filed their papers in support of settlement,
represents a significant restatement of the commonality
requirement. "Commonality requires the plaintiff to demonstrate
that the class members 'have suffered the same injury.'" <u>Wal-Mart</u>,
2011 WL 2437013, at *9 (quoting <u>Gen. Tel. Co. of the Southwest v.
Falcon</u>, 457 U.S. 147, 157 (1982)). The class members' "claims must

---

[3] ECF No. 72-1.

depend on a common contention," and that common contention must be "of such a nature that it is capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Id.

Plaintiffs offer a list of nine "common questions" as proof that the commonality requirement is satisfied:

(a) Whether Hughes was unjustly enriched by unfairly charging flat rate early termination fees without taking into consideration its actual damages. (See Third Amended Complaint ("TAC") at ¶ 17(h));

(b) Whether Hughes was unjustly enriched in selling Plaintiffs and the Settlement Class defective broadband and satellite service (TAC at ¶ 17(i));

(c) Whether Hughes falsely advertised to Settlement Class members by marketing and advertising its services as reliable, consistent high speed broadband satellite service (TAC at ¶ 17(a));

(d) Whether Hughes, through false advertising and otherwise, misrepresented to Settlement Class members the maximum upload and download speeds of its various Hughes service plans (TAC at ¶ 17(b));

(e) Whether Hughes, through false advertising and otherwise, misrepresented to Settlement Class members the volume of data that can be downloaded continuously through its Hughes service plans (TAC at ¶ 17(c));

(f) Whether Hughes, through false advertising and otherwise, misrepresented to Settlement Class members the maximum upload and download capability of its Hughes satellite and broadband service subscriber equipment and hardware (TAC at ¶ 17(d));

(g) Whether Hughes oversold its bandwidth, thereby adversely affecting Settlement Class members' satellite broadband service;

United States District Court
For the Northern District of California

(h) Whether Hughes fraudulently induced Settlement Class members to upgrade their service and incur additional fees by misrepresenting the benefits of upgrading in terms of speed, accessibility, functionality and connectivity of its Hughes broadband satellite services (TAC at ¶ 17(g)); and

(i) Whether Hughes unfairly imposed early termination fees upon Settlement Class members (TAC at ¶ 17(h)).

Pls.' Supp. Br. at 13.

Plaintiffs do not attempt to explain how these questions are common to any of the four claims pleaded in their TAC. This failure is troubling, given Plaintiffs' eleventh-hour attempt to certify a nationwide class. Plaintiffs bring four state-law causes of action and no federal causes of action. Plaintiffs do not argue that California law would apply to the claims of class members outside of California; nor do they attempt to argue that a cause of action would be supported by the law of other states. Whereas Plaintiffs' first cause of action was formerly violation of California's Consumer Legal Remedies Act, now Plaintiffs claim violation of "[t]he Consumer Legal Remedies Act <u>and similar applicable consumer protection law of other states</u>." TAC ¶ 74 (emphasis added). Because Plaintiffs have not even identified the law to be applied in this action, the Court cannot find that there are questions of law or fact common to the class. Accordingly, the Court finds the commonality requirement to be unsatisfied.

### 3. <u>Typicality</u>

Rule 23(a)(3) requires that the representative parties' claims be "typical of the claims . . . of the class." Fed. R. Civ. P. 23(a)(3). "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those

United States District Court
For the Northern District of California

of absent class members; they need not be substantially identical." Hanlon, 150 F.3d at 1020.  Rule 23 "does not require the named plaintiffs to be identically situated with all other class members. It is enough if their situations share a common issue of law or fact and are sufficiently parallel to insure a vigorous and full presentation of all claims for relief."  Cal. Rural Legal Assist., Inc. v. Legal Servs. Corp., 917 F.2d 1171, 1175 (9th Cir. 1990). In practice, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge."  Falcon, 457 U.S. at 157 n.13.

Plaintiffs argue that the named Plaintiffs "have precisely the same claims as the Settlement Class," and allege that each Plaintiff "truly represents a sector of the claims being addressed by the settlement."  Pls.' Supp. Br. at 14.  Walter claims to have "experienced numerous service disruptions due to reaching her download threshold;" Bayless "terminated his service due to dissatisfaction with speed and service and paid an ETF;" and Schumacher "terminated his service but did not pay an ETF."  Id. at 14-15.

As with the commonality requirement, the Court finds the typicality requirement unsatisfied.  It is true that the injuries claimed by the three named Plaintiffs mirror the injuries alleged to have been experienced by the class as a whole -- they are caused by Hughes's allegedly unfair or illegal FAP and ETF and misleading advertising of Internet speed.  But while Plaintiffs draw parallels between the alleged injuries to named Plaintiffs and the class as a whole, they fail to draw parallels between named Plaintiffs' legal claims and the legal claims of the class as a whole.  Named Plaintiffs are California residents, and it appears that California

1    law would apply to their claims.  Plaintiffs do not argue that

2    California law would apply to the claims of non-California resident

3    class members.  As such, the Court finds this requirement

4    unsatisfied.

5                    4.  <u>Adequacy of Representation</u>

6        Rule 23(a)(4) requires a showing that "the representative

7    parties will fairly and adequately protect the interests of the

8    class."  Fed. R. Civ. P. 23(a)(4).  This factor requires: (1) that

9    Plaintiffs are represented by qualified and competent counsel and

10   (2) that the proposed representative Plaintiffs do not have

11   conflicts of interest with the proposed class.  <u>Hanlon</u>, 150 F.3d at

12   1020, 603 F.3d at 614.

13       Plaintiffs allege that "Plaintiffs and putative class members

14   are represented by extremely qualified counsel with extensive

15   collective experience prosecuting complex consumer class actions

16   cases of this nature."  Pls.' Supp. Br. at 16.  The Court has

17   reviewed the curriculum vitae submitted and sees no issue with the

18   qualification and experience of Plaintiffs' counsel.  However, the

19   Court finds that Plaintiffs' counsel's work on this Motion speaks

20   volumes, and the Court is not convinced by this work that

21   Plaintiffs' counsel would adequately represent the class.

22       As to the second requirement, Plaintiffs state that their

23   claims are co-extensive with the settlement because

24               (1) Plaintiffs and each Settlement Class Member
                 have been injured in the same manner by Hughes
25               by being forced to comply with an unlawful ETF
                 policy and for entering into their respective
26               service contracts on the basis of false
                 information regarding the speeds of service
27               obtainable under each respective internet
                 service plan, (2) Plaintiffs and each
28               Settlement Class Member have an identical

**United States District Court**
For the Northern District of California

> interest in establishing Hughes' liability for imposing an unlawful ETF and falsely advertising the speeds of service available under each respective internet service plan, (3) Plaintiffs assert the same legal claims and theories as would all other Settlement Class Members under the factual and legal theories enumerated above, and (4) Plaintiffs seek the identical relief that would be sought by all members of the Settlement Class.

Pls.' Supp. Br. at 16.

Plaintiffs' argument is flawed. Plaintiffs' contention that the named Plaintiffs "assert the same legal claims and theories as would all Settlement Class Members" is not true given that class members outside California would likely bring claims under the laws of their states. It is possible that the remedies provided under the laws of the fifty states are so similar as to render the Named Plaintiffs adequate class representatives, but Plaintiffs have not argued this in their papers.

### 5.   <u>Predominance and Superiority</u>

Rule 23(b)(3) requires the court to find that "the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). While evaluation of Rule 23's predominance requirement on a settlement motion does not require an analysis of potential trial management problems, "other specifications of the Rule -- those designed to protect absentees by blocking unwarranted or overbroad class definitions -- demand undiluted, even heightened, attention in the settlement context." <u>Amchem</u>, 521 U.S. at 20. The terms of a proposed settlement are "relevant to a class certification." <u>Id.</u> Rule 23(b)(3) also requires that the class action be "superior to other available methods for fairly and

**United States District Court**
For the Northern District of California

1   efficiently adjudicating the controversy."  Fed. R. Civ. P.

2   23(b)(3).  The factors relevant to assessing superiority include:

3              (A)  the  class  members'  interests  in
               individually  controlling  the  prosecution  or
4              defense of separate actions; (B) the extent and
               nature  of  any  litigation  concerning  the
5              controversy already begun by or against class
               members; (C) the desirability or undesirability
6              of concentrating the litigation of the claims
               in the particular forum; and (D) the likely
7              difficulties in managing a class action.

8   Fed. R. Civ. P. 23(b)(3).

9       Plaintiffs identify eight legal questions which they claim

10  predominate, such as "Whether HughesNet's conduct violates the

11  unfair competition law, such as California Business and Professions

12  Code § 17200 et seq. and similar laws of other states."  Pls.'

13  Supp. Br. at 19.  As the Court noted above, Plaintiffs have not

14  satisfied the commonality requirement, and because they have not

15  identified a single common question of law or fact, the Court

16  cannot find that common questions predominate.

17      Plaintiffs state that the superiority requirement is satisfied

18  because "this case involves multiple claims for relatively small

19  sums," making class treatment superior to "alternative methods."

20  Pls.' Supp. Br. at 20.  While it is true that the settlement

21  contemplates awards of $5 and $40 to class members who return a

22  claim form, the named Plaintiffs seek $5,000, a considerably higher

23  amount.  If this $5,000 figure represents a potential recovery at

24  trial, then the class's claims may be large enough to justify

25  individual actions.

26      For these reasons, the Court finds that Plaintiffs have failed

27  to satisfy Rule 23's requirements.  The Court notes that all of the

28  flaws it has identified are curable through amended pleadings or

alteration of the terms of the settlement, and so it grants parties leave to file an amended motion for settlement.  In the interest of judicial economy, it also evaluates the fairness of the settlement and the adequacy of the proposed notice.

**B.   Fairness of the Settlement**

The Ninth Circuit has warned that "there are real dangers in the negotiation of class action settlements of compromising the interests of class members," because "[i]ncentives inherent in class-action settlements" can "result in a decree in which the rights of [class members, including the named plaintiffs] may not [be] given due regard by the negotiating parties." Staton, 327 F.3d at 959 (internal quotation marks omitted).  These incentives stem from the fact that "[t]he class members are not at the table; class counsel and counsel for the defendants are." Id.  This can "influence the result of the negotiations without any explicit expression or secret cabals," and is why "district court review of class action settlements includes not only consideration of whether there was actual fraud, overreaching or collusion but, as well, substantive consideration of whether the terms of the decree are 'fair, reasonable and adequate to all concerned.'" Id. at 950 (citing Officers for Justice v. Civ. Serv. Comm'n of San Francisco, 688 F.2d 615, 625 (9th Cir. 1982)).  Due in part to these dangers of "collusion between class counsel and the defendant," the Ninth Circuit has adopted the rule of other circuits that "settlement approval that takes place prior to formal class certification requires a higher standard of fairness," leading to "a more probing inquiry than may normally be required under Rule 23(e)." Hanlon, 150 F.3d at 1026.

**United States District Court**
For the Northern District of California

21

United States District Court
For the Northern District of California

1   Not all proposed class action settlements require the same

2   level of court scrutiny -- if the class had the opportunity to

3   participate in settlement negotiations, the Court need not assume

4   the role of class advocate.  Similarly, a settlement that is

5   structured such that the interests of the class are tied to the

6   interests of the named plaintiffs, their counsel, or the defendant

7   demands less scrutiny.  For example, a settlement that ties the

8   size of the class counsel's attorney fee award to the number of

9   claim forms submitted or the amount disbursed to the class gives

10  class counsel motivation to ensure that notice to the class is as

11  effective as possible.  Similarly, because a defendant benefits

12  from the largest possible release of liability, a settlement in

13  which only class members who submit a claim form release their

14  claims against a defendant aligns the interests of the defendant

15  and the class members.

16  No such alignments are present here: all parties present

17  during negotiation of the settlement stand to benefit regardless of

18  whether the class members receive a benefit.  The three Named

19  Plaintiffs would receive up to $5,000 in incentive payments,

20  subject to Court approval, regardless of the size of the award to

21  the class.  The settlement contemplates $980,000 in attorneys' fees

22  paid to Plaintiffs' counsel; this proposed award is not tied to the

23  total amount recovered by the class.  And Hughes would receive a

24  considerable benefit -- a release of every related claim that could

25  be brought by its 1.1 million subscriber base -- even if no claim

26  forms were submitted and no funds were distributed to the class.

27  As such, the parties have designed a settlement containing no

28  structural protections of the interests of the class as a whole.

**United States District Court**
For the Northern District of California

1    Hence, the parties force the Court into the role of class

2  advocate.

3         1.   <u>Substantive Issues</u>

4    Under the settlement, around 40 percent of the class -- former

5  subscribers who did not pay an ETF -- would be eligible to receive

6  a $5 cash payment.  Around seven percent of the class -- former

7  subscribers who did pay an ETF -- would be eligible to receive the

8  $40 cash payment.  The remaining class members -- Hughes's current

9  subscriber base -- would receive no benefit except the proposed

10  injunctive relief.  Obviously, Hughes's former subscribers would

11  derive no benefit from the proposed injunctive relief.

12    In exchange for this relief, every class member who does not

13  affirmatively opt out of the settlement would be subject to the

14  settlement's release of liability:

15         [Class members] [s]hall release and forever
         discharge, and shall be forever barred from
16         instituting, maintaining or prosecuting against
         any or all of the Released Persons, any and all
17         claims, liens, demands, actions, causes of
         action, obligations, damages or liabilities of
18         any nature whatsoever, whether legal, equitable
         or otherwise, arising from or relating to the
19         subject matter of this Litigation, including,
         without limitation, the charging of ETFs, the
20         HughesNet Fair Access Policy, the actual or
         advertised download, upload or other internet
21         speeds, any advertising or other public
         statement relating to the foregoing and/or any
22         other matter alleged in the Complaint
         (collectively, the "Claims"), insofar as such
23         Claims were asserted or could have been
         asserted in this Litigation or in any other
24         lawsuit or arbitration proceeding in any venue
         or forum on or before the date of the Final
25         Order Date, or based on Hughes implementation
         of this Settlement Agreement in accordance with
26         its terms.

27  Settlement § 4.1.  The Long Form summarizes this release as one

28  freeing Hughes and affiliated persons "from all claims of liability

**United States District Court**
For the Northern District of California

1  that were asserted or that could have been asserted in the lawsuit,

2  or in other legal proceedings or forums, arising from or relating

3  to the subject matter of the lawsuit." Long Form at 5. The

4  Postcard summarizes this release as one of "claims related to the

5  matters alleged in the lawsuit that you may have against Hughes and

6  others." See Postcard.

7      This release is obtusely written. Notice of the terms of the

8  settlement must be provided to the class "in plain, easily

9  understood language." Fed. R. Civ. P 23(c)(2)(B). If one accepts

10  the accuracy of the Long Form's summary of the release, all claims

11  relating to Hughes's charging of ETFs, its FAP, its advertising,

12  and the speed of its service would be released. This is a

13  particularly broad release, and while it does not render the

14  settlement unfair, its breadth should be considered in evaluating

15  the fairness of the settlement.

16      The amount to be paid to the class is, of course, an important

17  factor in determining the fairness of a settlement. The Court

18  instructed the parties to estimate the "total gross amount to be

19  recovered by the class, supported by appropriate evidence." Feb.

20  3, 2011 Order. Instead of doing this, Plaintiffs provide "the

21  total amount of cash compensation available to the Class under the

22  Settlement," (emphasis added) which they estimate to be

23  approximately $5,282,010. This represents the total amount Hughes

24  would pay if every single class member who was eligible to receive

25  a cash benefit received notice of the settlement and submitted a

26  timely and valid claim form.

27      Plaintiffs' offer of the total compensation available in lieu

28  of total compensation paid is disingenuous. Plaintiffs' counsel

**United States District Court**
For the Northern District of California

claim to be "extremely qualified counsel with extensive experience prosecuting complex consumer class actions cases of this nature." Pls.' Supp. Br. at 16.  As such, they certainly should have the means to estimate class participation in a settlement such as this one.  They are no doubt aware that average claims submission rates in similar class actions are typically ten percent or less.  See, e.g., In re Compact Disc Minimum Advertised Price Antitrust Litig., 370 F. Supp. 2d 320, 321 (D. Me. 2005) (two percent submission rate); Buchet v. ITT Consumer Fin. Corp., 845 F. Supp. 684, 695 (D. Minn. 1994), as amended 858 F. Supp. 944 (rejecting settlement where similar settlement had only a three percent redemption rate); Strong v. Bellsouth Telecomm., Inc., 173 F.R.D. 167, 169 (W.D. La. 1997) (4.3 percent claims rate); Burch v. United Cable TV of Baltimore Ltd. P'ship, 732 A.2d 88 7 (Md. 1999) (9.7 percent response rate to claims process); Union Life Fid. Ins. Co. v. McCurdy, 781 So. 2d 1 86, 188 (Ala. 2000) (observing that only 113 of 104,000 class members submitted claims, for a rate of 0.1 percent).  Assuming a rather generous ten percent response rate, the Court estimates that roughly $500,000 will be paid to the class.  This amount is dwarfed by Plaintiffs' counsel's anticipated motion for $980,000 in attorney's fees.

Plaintiffs also provide unrealistic estimates of the value of the injunctive relief available under the settlement.  Plaintiffs claim that Hughes's revised FAP and its pro-rated early termination fee confer a benefit of $14 million upon the class.  Having reviewed the declarations submitted in support of this figure, the Court is extremely skeptical of the accuracy of this estimate.  Setting aside its accuracy, however, Plaintiffs fail to state that

**United States District Court**
For the Northern District of California

1   this injunctive relief provides no benefit to the roughly half of
2   the class who are no longer Hughes subscribers.  Also, part of the
3   benefit of the injunctive relief would be conferred upon future
4   Hughes subscribers, and these individuals are not part of the
5   settlement class and would not be bound by the release of
6   liability.

7        Despite serious concerns with the confusing wording of the
8   release and considerable skepticism as to Plaintiffs' estimate of
9   the settlement's value to the class, the Court does not find the
10  substantive terms of the settlement to be inherently unfair at this
11  time.  The Court finds the question of substantive fairness to be
12  more appropriate for objecting class members to raise if and when
13  this settlement reaches the final approval stage.

14               2.   Procedural Issues

15       While Rule 23(e)(5) gives class members the opportunity to
16  object to the substance of the settlement at the final fairness
17  hearing, this often occurs too late in the proceedings to address
18  procedural issues, such as flaws in the claims submission process.
19  As such, the Court reviews the design of the claims process
20  closely.

21       Under the settlement, class members can receive $5 if they
22  returned their Hughes equipment and $40 if they also paid an ETF
23  during the stated period.  Many hurdles stand between a class
24  member and the receipt of such a payment, however, and such
25  additional steps tend to lower class participation.  See Tiffany
26  Allen, "Anticipating Claims Filing Rates in Class Action
27  Settlements" (Nov. 2008) ("A settlement that requires claimants
28  simply to sign a form will likely have a higher claims-filing rate

than one requiring claimants to provide narrative responses to questions and attach documentation, all other things being equal.") First, the class member must receive notice of the settlement. Class members will not be sent claim forms. Assuming a class member receives the Postcard, he or she must comb through the small type on the Postcard to find the Web site he or she must access for more information about the settlement. The class member would then have to use a computer to access the settlement Web site, follow the links on the settlement Web site to locate the Claim Form, download the Claim Form, print out the Claim Form, fill out the Claim Form with the required personal information, and mail the Claim Form to the claims administrator during the claims period. The class members would bear the cost of the forty-four cent postage stamp required to submit the Claim Form.

The design of the Claim Form presents problems of its own. It states that to receive a cash payment of $40, the claimant must affirm that during the period, the claimant (1) subscribed to a Hughes satellite broadband consumer Internet service plan; (2) was no longer a Hughes subscriber as of the preliminary approval date; (3) paid an ETF between May 15, 2005 and December 5, 2010; and (4) returned "all equipment leased from or provided by Hughes within ninety (90) days" of termination of the subscription. To receive a cash payment of $5, the claimant must affirm that the claimant (1) was a Hughes subscriber, (2) was no longer a Hughes subscriber as of the date by which Hughes must complete notice; (3) did not pay an early termination fee, or paid an ETF on or after December 6, 2010, and (4) returned all equipment leased from or provided by Hughes within ninety days of termination. The claimant must

**United States District Court**
For the Northern District of California

1   provide his or her name, address, "email address(es) used in

2   corresponding with Hughes," and his or her "current email address,"

3   and sign and date the claim form under penalty of perjury.  The

4   claimant must mail this form to the settlement administrator before

5   the stated deadline.

6       The Claim Form suffers from several problems.  First, it

7   includes a limitation that is not provided in the Long Form or the

8   Summary Notice -- namely, the requirement that the claimant

9   returned all equipment "leased from or provided by Hughes" within

10  ninety days of termination.  Second, this limitation is so vague as

11  to likely discourage some class members from filing a claim --

12  while it may be clear to class members what constitutes "equipment

13  leased" from Hughes, it is less clear what is required by the

14  provision mandating the return of equipment "provided by" Hughes.

15  Third, the Claim Form is unnecessarily complex.  It is two pages

16  long, it contains unnecessary language, and it is confusingly

17  arranged.  Like a poorly drafted verdict form, it invites user

18  error.  Finally, the Claim Form creates an infinite feedback loop;

19  it reflexively cites to the Class Notice and Settlement Agreement

20  "for eligibility and claims rules," while the Class Notice refers

21  class members to the Claim Form for additional eligibility

22  requirements.

23      It would be rational for a class member to invest the time and

24  effort to perform the above steps and scrutinize the claim form if

25  the economic incentive for so doing was great enough.  But the vast

26  majority of class members who would receive any cash payment under

27  the settlement would receive a mere $5.  Many class members will

28  likely find that given the size of the cash benefit and the amount

**United States District Court**
For the Northern District of California

1   of time required to submit a claim, it simply is not worth the time

2   and effort to submit a claim.

3       There are many ways the parties could improve the claim

4   submission procedure, such as by allowing class members to make

5   claims using an online form or by mailing settlement checks to each

6   class member who, according to Hughes's records, satisfies the

7   requirements for such a claim.  For unknown reasons, the parties

8   have opted for an unnecessarily taxing claims procedure over these

9   alternatives.  The Court finds that in light of the small cash

10  benefits contemplated, the proposed claim procedure is

11  unreasonable.

12      **C.**    <u>**Adequacy of Proposed Notice**</u>

13      Notice to the class must provide:

14          the best notice practicable under the
    circumstances, including individual notice to
15  all members who can be identified through
    reasonable effort. The notice must concisely
16  and clearly state in plain, easily understood
    language: the nature of the action; the
17  definition of the class certified; the class
    claims, issues, or defenses; that a class
18  member may enter an appearance through counsel
    if the member so desires; that the court will
19  exclude from the class any member who requests
    exclusion, stating when and how members may
20  elect to be excluded; and the binding effect of
    a class judgment on class members under Rule
21  23(c)(3).

22  Fed. R. Civ. P. 23(c)(2)(B).

23      The Federal Judicial Center's "Judges' Class Action Notice and

24  Claims Process Checklist and Plain Language Guide" ("FJC Class

25  Action Checklist"), available through the FJC Web site, provides

26  guidance for judges and counsel in determining whether a notice

27  plan is adequate.  Among other things, this guide instructs parties

28  and reviewing courts to ask, "Will the notices come to the

29

**United States District Court**
For the Northern District of California

attention of the class?" and "Are the notices informative and easy to understand?"  Id.

The Postcard, which would be sent via U.S. mail, is postcard-sized.  It provides the case name and is titled, "NOTICE OF PROPOSED CLASS ACTION SETTLEMENT."  It does not state the size of the awards to class members; it merely informs its recipient that the settlement, if approved, "may entitle you to cash or non-cash benefits."  It directs class members to read the Long Form, found online, for a description of "all eligibility requirements to receive a cash benefit."  Other than the deadlines for submitting claim forms and exclusion from the settlement, it provides no other pertinent information to the class.  It does not include information about how to object to the settlement, nor does it state that Plaintiffs' counsel seeks a $980,000 award of attorneys' fees.  It is written in small type and aside from a provision in capital letters stating, "YOUR LEGAL RIGHTS MIGHT BE AFFECTED BY THIS SETTLEMENT.  PLEASE READ THIS NOTICE CAREFULLY," it is devoid of text treatment or graphic elements to command class members' attention.  Direct mail companies have developed a number of innovative techniques to ensure their mailings stand out.  The Postcard uses none of these techniques.

The Long Form, which would be e-mailed to the class members for whom Hughes has a valid e-mail address and posted on the settlement Web site, is a seven-page document.  See Long Form. It does not command the attention of the class.  It appears to be a court document, complete with a case caption.  While it accurately reflects most of the terms of the Settlement Agreement, it does not state every requirement for receiving a cash payment, but rather

**United States District Court**
For the Northern District of California

1  directs class members to the "conditions described on the Claim

2  Form."  Id. § 4(a).

3      The Summary Notice would be published as a one-eighth-page

4  advertisement in USA Today on two consecutive days.  This document

5  contains much of the information contained in the Long Form,

6  including the size of the cash benefits available, and directs

7  readers to visit the settlement Web site for more information.

8  However, like the Long Form, it is merely a collection of small-

9  print text, and does not appear designed to command the attention

10  of USA Today's readers.

11      In sum, the Court is not convinced that the proposed notice

12  plan would provide the class with "the best notice practicable

13  under the circumstances" as Rule 23 requires.  It appears as though

14  very little effort was expended by the parties to ensure the

15  largest possible number of class members received notice.

16      In light of the above, the Court DENIES Plaintiffs' Motion.

17  The Court finds that Plaintiffs have failed to establish that Rule

18  23's class certification requirements of commonality, typicality,

19  predominance, and adequacy of representation are satisfied for a

20  nationwide class of Hughes's current and former subscribers.  The

21  Court finds the claims procedure contemplated in the settlement to

22  be unreasonable given the small size of the cash payments available

23  to class members.  Finally, the Court finds that Plaintiffs have

24  failed to establish that the proposed notice plan would provide the

25  class with the best notice practicable under the circumstances.

26      The Court recognizes that a fair settlement is considerably

27  preferable to all parties than protracted litigation.  While the

28  proposed settlement is unfair, it is not beyond salvage through

**United States District Court**
For the Northern District of California

1   amendment.   Furthermore, the Court is convinced that a fair

2   settlement could be reached without increasing the cost or burden

3   on Hughes -- the parties value this settlement at roughly $20

4   million, which should be enough to effect a fair settlement.   As

5   such, the Court has labored to provide the parties with guidance

6   should they decide to file an amended motion for preliminary

7   approval.   The parties must establish that a nationwide class

8   exists and that the Named Plaintiffs are proper representatives of

9   that class.   The parties must provide a claims procedure that is

10  simple and easy enough to encourage, rather than inhibit,

11  participation by class members despite the small size of the cash

12  awards.   The parties must clearly and explicitly communicate the

13  scope of the release of liability to the class members.   The

14  parties must design the best notice plan practicable under the

15  circumstances, and provide the Court with a realistic reach

16  calculation for the plan.   Furthermore, if the parties alter the

17  settlement such that the interests of either Plaintiffs' counsel or

18  Hughes is aligned with the interests of the class, the Court will

19  apply considerably less scrutiny in reviewing it.   The Court puts

20  the parties on notice that if the Court does ultimately

21  preliminarily approve the settlement, it may delay ruling on an

22  attorneys' fees motion until after all settlement proceeds have

23  been disbursed to the class in order to determine the fairness of

24  the amount sought in attorneys' fees in light of the total benefit

25  conferred on the class.

26  ///

27  ///

28  ///

**V.**   **CONCLUSION**

For the foregoing reasons, the Court DENIES the Motion for Preliminary Approval of Settlement filed by Plaintiffs Tina Walter, Christopher Bayless, and Eric Schumacher.  The parties are granted leave to file an amended motion.  A status conference is set for Friday, August 26, 2011, at 10:00 a.m., in Courtroom 1, 450 Golden Gate Avenue, San Francisco, California.  The parties shall meet and confer and file a joint case management statement no less than seven (7) days before the status conference.

IT IS SO ORDERED.

Dated: July 6, 2011

_____
UNITED STATES DISTRICT JUDGE